No. 29,522.

I. C. Stevenson, *Plaintiff*, v. J. F. Metsker, as County Treasurer of Douglas County, *Defendant*.

(286 Pac. 673.)

Opinion filed March 19, 1930.

*C. E. Lindley,* of Lawrence, and *J. G. Egan,* assistant attorney-general, for the plaintiff; *William A. Smith,* attorney-general, of counsel.

*C. B. Randall,* attorney for the State Tax Commission, for the defendant.

*John L. Hunt,* attorney for the Kansas Bankers' Association, as *amicus curiæ.*

The opinion of the court was delivered by

Burch, J.: The action is one of mandamus commenced in this court, which has original jurisdiction in such cases. The petition was filed on March 1, 1930. The cause was advanced, and was set for hearing on March 5, on application for a peremptory writ. On March 5 the cause was submitted on oral arguments and typewritten briefs. The court conferred immediately after the arguments were concluded, and decided the writ should be denied. The decision was announced at once, and the purpose of this opinion is to state the reasons for the court's judgment.

The petition alleged, in substance, that plaintiff is the owner of real estate in the city of Lawrence, in Douglas county; that the first half of the taxes assessed against the real estate for the year 1929, at the general-property rate, was duly paid in December, 1929, and the second half of the taxes was payable on or before

June 20, 1930; that on February 20 plaintiff tendered to the county treasurer of Douglas county, as full payment for the second half, a sum of money sufficient to discharge the taxes if computed at what is known as the intangible rate, which is much lower than the general-property rate, and that the tender was refused. The prayer was that a peremptory writ issue requiring the county treasurer to accept the tender and to receipt in full for the whole amount of the second half of the taxes.

Previous to 1923 sections 1 and 2 of article 11 of the state constitution, relating to finance and taxation, read as follows:

"§ 1. The legislature shall provide a uniform and equal rate of assessment and taxation; but [provision relating to exemption from taxation].

"§ 2. The legislature shall provide for taxing the notes and bills discounted or purchased, moneys loaned, and other property, effects, or dues of every description (without deduction) of all banks now existing, or hereafter to be created, and of all bankers; so that all property employed in banking shall always bear a burden of taxation equal to that imposed upon the property of individuals."

The legislature of 1923 submitted to the qualified electors of the state an amendment of these sections, reading as follows:

"SECTION 1. . . . That sections 1 and 2, article 11, be amended and combined into one section, to read as follows: Section 1. The legislature shall provide for a uniform and equal rate of assessment and taxation, except that mineral products, money, mortgages, notes and other evidence of debt may be classified and taxed uniformly as to class as the legislature shall provide. [Provision relating to exemption from taxation.]" (Laws 1923, ch. 255.)

The amendment was adopted by a vote of 250,813 for to 196,852 against. Under authority of the amendment, the legislature enacted the mortgage-registration law, the intangible-tax law, and the secured-debts law, providing for low rate of taxation on classified property, which, for convenience, will be called the intangible rate. In the case of *Voran v. Wright*, 129 Kan. 601, 284 Pac. 807, the court decided, in substance, that shareholders in state banks were entitled to the benefit of the intangible rate, and plaintiff's contention is based on his interpretation of the effect of that decision.

The problem for solution in *Voran v. Wright* involved application of the intangible rate in taxation of shares of state bank stock. The relation of the intangible rate to the general tax law of the state was not involved, and the question presented in this case was not decided. Students in accredited law schools, all of which use

the case method of instruction, are taught that a court decision is not authoritative except with respect to the matter decided, and that the language of a judicial opinion is to be construed as referring to the subject under decision. In this instance the court did not put on "syllogistic seven-league boots" and leap from a particular premise to a universal conclusion which would wreck the tax system of the state and plunge the state into financial chaos.

The precise contention of plaintiff is this: A share of bank stock is not property falling within any of the classes mentioned in the amendment to the constitution. It is not a mineral product, nor money, nor mortgage, nor note, nor other evidence of debt. Therefore, a share of bank stock is simply a species of common unclassified property. Under the decision in the Voran case a share of state bank stock is to be taxed at the intangible rate. This being true, other common unclassified property, such as plaintiff's land, must be taxed at the intangible rate. Unless so taxed, land is discriminated against, and the discrimination is unlawful under the uniform and equal-rate clause of the constitution.

By way of approach to solution of the problem, it may be observed that deductive reasoning may land us in endless difficulty. Refractory facts cannot be reconciled with the conclusions, and it becomes necessary to reëxamine premises. It will be recalled that Adam Smith created a science of political economy on the premise of an economic man. The economic man is dead, and economists jest among themselves as to who killed him. When legal theory finds itself confronted with contradictory theory in the field of taxation, it may be necessary to retreat to the low and humble ground of fact, and try to make the law conform to fact. Otherwise we might have the result of the famous fight between the gingham dog and the calico cat. Quarreling theories might eat each other up, and there would be no money to run the government. In this state the difficulty arises in the adjustment of taxation, placed in constitutional strait-jacket when life was simple, to the complexities and heterogeneities of a highly developed, progressive, industrial society.

It will be observed that section 2 of article 11 of the constitution, before it was amended, prescribed in detail a method for taxing banks. A tax law was framed according to the constitution, and state banks were organized and employed property in the business of banking. Then came the national banking system, and congress

made a concession to the states relating to taxation of national banks.

The power to tax is an attribute of the state's own political sovereignty, and it has full power to tax its own people and property in its own way. In the case of *Michigan Central Railroad v. Powers*, 201 U. S. 245, the supreme court of the United States, speaking through Mr. Justice Brewer, said:

"We have had frequent occasion to consider questions of state taxation in the light of the federal constitution, and the scope and limits of national interference are well settled. There is no general supervision on the part of the nation over state taxation, and in respect to the latter the state has, speaking generally, the freedom of a sovereign both as to objects and methods. It was well said by Judge Wanty, delivering the opinion of the circuit court in this case:

" 'There can at this time be no question, after the frequent and uniform expressions of the federal supreme court, that it was not designed by the fourteenth amendment to the constitution to prevent a state from changing its system of taxation in all proper and reasonable ways, nor to compel the states to adopt an ironclad rule of equality, to prevent the classification of property for purposes of taxation, or the imposition of different rates upon different classes. It is enough that there is no discrimination in favor of one as against another of the same class, and the method for the assessment and collection of the tax is not inconsistent with natural justice.' " (p. 292.)

The federal statute relating to state taxation as affecting national banking is a statute removing to a limited extent the bar to exercise of the state's power to tax a federal agency. All the property and effects of national banks, except real estate, were withheld from taxation by the state, just as public buildings of the federal government, situated within the territory comprising the state, are withheld from the state's jurisdiction to tax. That did not prevent the state from taxing its own banks according to its own constitution. The federal government had no interest in that subject. Its sole interest was, and is, to see that the limited jurisdiction conceded to the state with reference to taxation in connection with national banking is not transgressed. So far as power was concerned, the legislature of this state might have continued to tax state banks according to the explicit command of the constitution. Did the legislature do that? It did not. Why? The legislature encountered the tough economic fact that to do so would kill off state banks. They could not compete with national banks. The legislature was faced with two necessities: necessity to observe federal law, and necessity to observe the state constitution. The situation did not admit of logical or philosophical solution; and by way of

practical solution, the constitution was ignored. Section 2 of article 11 was printed in the law books until after the election in 1924, but because of dire economic consequences not foreseen or foreseeable when the constitution was framed in 1859, the section became a scrap of paper.

In due time the state's tax law was revised to equalize taxation pertaining to national banks and state banks, and in 1891 a statute intended further to accomplish that purpose was enacted. The first section began as follows:

"Stockholders in banks and banking associations and loan and investment companies organized under the laws of this state or the United States, shall be assessed and taxed on the true value of their shares of stock. . . ." (Laws 1891, ch. 84.)

Method of assessment was prescribed, and provision was made for deduction of real estate belonging in fee simple to the bank and taxation of such real estate under the general law. Provision was also made for payment of shareholders' taxes by the bank, which was given a lien on the shares. This statute was interpreted in the case of *Bank v. Geary County*, 102 Kan. 334, 170 Pac. 33. Confusion of theory and ambiguity of terms used in the statute were noted, and impossibility of executing the statute according to its phraseology was pointed out. As interpreted by the court, the statute became a workable tax law. Paragraphs 1 and 2 of the syllabus of the decision read as follows:

"The tax contemplated by section 11236 of the General Statutes of 1915, relating to taxation of national banks, state banks, and loan or investment companies, is a tax on shares of stock in the hands of stockholders, and not a tax on capital stock or assets, the property of the corporation.

"Shares of stock are to be assessed at their true value, which may or may not coincide with their bookkeeping value." (p. 334.)

In the opinion emphasis was placed on the distinction between property of the bank, which was not taxed, and property of the shareholders, which was taxed, and the standard according to which stockholders were to be taxed on their property was stressed. That standard was "the true value." Elements of true value were enumerated by the court.

The statute contained an implied exemption from taxation. On the theory of distinction between property of the bank and property of the shareholder, the value of property of the bank is one economic unit, unit A. The value of all the shares is a separate and distinct economic unit, unit B. The residue of unit A, after deduct-

ing real estate, is not taxed. That residue is not a part of unit B, any more than Smith's property is a part of Brown's property. Early in the constitutional history of the state it was held, in accordance with the common understanding when the constitution was adopted, that the constitution prescribed a minimum exemption, which may be enlarged according to the wisdom and discretion of the legislature. Power to exempt is not, however, without limitation, and the court has frequently been confronted, in the field of taxation, with the problem, "When is far too far?" In the case of *Wheeler v. Weightman*, 96 Kan. 50, 149 Pac. 977, the court dealt with this problem, and held the legislature's attempt to tax mortgages at a low rate and exempt them from further taxation could not be justified under the constitution then in force. In this instance the exemption should be considered in the light of the facts.

A private banker has all his wealth invested in the banking business. He incorporates, and gives a qualifying share to each of four persons, members of his family, or relatives, or friends, to comply with the law and form a board of directors. All the funds and property go to the corporation, part as capital stock and part as assets. No new taxable value has in fact been created, except value of the privilege to use the corporate form of organization in conducting the business. This would be true if the same persons, or other persons, took of their own wealth and started a bank. This is a fundamental fact-foundation beneath the doctrine of separate interests in things the subject of corporate ownership. Therefore, the court regards the implied exemption as a mere incident to operation of a tax law framed under the constraint of economic necessity, and in view of the results, not of sufficient moment to defeat the law. Likewise, if the increment of corporate privilege were not taxed, the omission would not invalidate the whole scheme of taxation, which cannot be made perfect.

The opinion in the Geary county case was filed in January, 1918. The next legislature, which convened in January, 1919, evidently regarded the decision as too severe on shareholders, and the law was amended in a manner which relegated portions of the opinion to innocuous desuetude. The statute of 1919 was amended in 1925, and as amended will be considered later.

As stated above, the constitution was amended, and the intangible-tax laws were enacted. The legislature did not intend that these laws should apply to taxation of bank shareholders, unless attempted exclusion of shareholders from benefit of the acts should

not be constitutionally permissible. But whatever the intention, whether the laws had an effect on taxation of national-bank shares depended on two things—fact and federal law. The fact to be ascertained was whether there was moneyed capital in the hands of individual citizens of the state coming in competition with the business of national banks. The fact that such capital exists cannot be denied. What is the federal law? The tax shall not be at a greater rate than is assessed upon other moneyed capital coming into competition with the business of national banks. (U. S. Rev. Stat. 5219.) This statute looks to the tax burden placed on those who furnish the money to finance a government agency which is the ultimate subject of protection; and that burden may not be made greater than the burden on competitive moneyed capital, directly or indirectly. This was made perfectly clear by the supreme court of the United States in the case of *People v. Weaver*, 100 U. S. 539 (1879).

An early form of section 5219 of the Revised Statutes of the United States provided that shares of national bank stock might be included in the value of personal property of the shareholders, "subject only to the two restrictions. . . ." One of the restrictions is not material here. The other was that the taxation should not be at a greater rate than that assessed on other moneyed capital coming into competition with the business of national banks. The state of New York passed an act which permitted shares to be valued higher in proportion to their true value than competitive moneyed capital was valued. This was accomplished by permitting certain deductions by holders of competitive moneyed capital, not permitted in assessing shares of bank stock. An equal rate was then applied. The express and definite provision of the law was "shall not be at a greater rate," which was the "only" restriction. The rate was precisely the same, and, starting with the philological premise, the conclusion arrived at by faultless logic was that the federal law was observed. What did the supreme court of the United States say about it? The court penetrated through form of expression to the substance of the state's privilege to tax, and the syllabus of the opinion reads:

"The provision in sec. 5219 of the Revised Statutes of the United States, that state taxation on the shares of any national banking association shall not be at a greater rate than is assessed on other moneyed capital in the hands of individual citizens of the state, has reference to the entire process of assess-

ment, and includes the valuation of the shares as well as the rate of percentage charged thereon.

"The statute of a state, therefore, which establishes a mode of assessment by which such shares are valued higher in proportion to their real value than other moneyed capital, is in conflict with that section, although no greater percentage is levied on such valuation than on that of other moneyed capital." (*People v. Weaver,* 100 U. S. 539.)

Applying the federal law to the facts, it is manifest that, when moneyed capital in competition with the business of a national bank is assessed at the intangible rate, the same kind of moneyed capital employed by the bank in its business and to be taken into account in fixing the tax burden cast on its shareholders must be assessed and taxed at the intangible rate.

In the Voran case the federal law was presented in such a manner that the court was obliged to discuss it. It was not regarded and could not be regarded by the court as law governing the decision. The federal statute was considered to discover what consequences resulted from it which might have a bearing on taxation of state banks under state law.

In the Voran case it appeared that more than 97 per cent of the personal property of the bank consisted of intangibles which, in the hands of others, would take the intangible rate. The shares were taxed at the general-property rate of $3.50 per $100. The shares of national banks, into the valuation of which the same kind of intangibles enter, and property of individual citizens consisting of the same kind of intangibles, pay 50 cents per $100. The combined capital, surplus and undivided profits of the state banks then in existence amounted to more than $41,000,000. The court refused to sanction a method of taxation producing such utterly indefensible discrimination, even though rejection of the method caused present financial loss to the state by reducing the amount of property taxed at the general rate. The court preferred to maintain the integrity of the constitution as amended.

Persons have interests in things, and those interests constitute the property of the possessors of the interests. The things are also called property, and, using the term in that way, the constitution permits classification of property, and not of owners of property. Property of a state bank which, if taxed to the bank as owner, would take the intangible rate is within the state's jurisdiction to tax. The legislature could not constitutionally exempt from taxation such an immense quantity of property, and does not do so.

The purpose is to tax it. In devising a mode of taxation the property was exempted from taxation to the owner, the bank. Intangibles are intangibles, and the nature of the property was not changed by exempting it from taxation to the owner, the bank. The same property still lay in the bank's vault, untaxed. What mode of taxation was adopted in order to tax the exempted intangibles? Different property belonging to somebody. else is taxed. His property, whatever it is, is subject to taxation just as the bank's property is subject to taxation; and how does taxing his property subject the bank's property to taxation? The method resorted to is this: The valuation of the property of the other owner is determined by taking into account the bank's intangibles. Now this removes the exemption, and reaches intangibles for the purpose of taxation, or it does not. If it removes the exemption, intangibles are taxed, the burden of the tax falls on the shareholder, and the effect of the intangible-tax law was to discriminate outrageously between actual owners of intangibles and those who, because they bear the burden, are economically the exact equivalent of owners of intangibles.

Realizing the gravity of the question involved in the Voran case, the court invited briefs from constitutional lawyers, lawyers expert in corporation and taxation law, and all others who could aid the court. Valuable assistance was received from *amici curiæ*, as well as from counsel in the case. The cause was argued, the court reached a conclusion, and an opinion was drafted. There was great pressure on the court for announcement of its conclusion, and because of exegencies in the court's work, the draft of the opinion was filed, with full realization that it was not in final form. Filing the draft accomplished the end in view. It furnished a definite basis for further critical study of the problem by all who were interested, and the court heard the case a second time, as it expected to do when the opinion was filed. The second argument was helpful, and among other suggestions attention was called to a statement made with only the provisos of a statute in mind, but which covered the entire act. The opinion was revised, reduced to final form, and filed. (*Voran v. Wright,* 129 Kan. 601, 284 Pac. 807.)

The people themselves, by the solemn process of constitutional amendment, granted to the legislature power to provide for taxation of some classes of property of enormous value at a much lower rate than other classes. The provision of the constitution requiring

uniform and equal rate of assessment and taxation was not otherwise changed by the amendment; and so far as taxation of bank shares was affected, the new wine had to be poured into the old constitutional bottles through a federal funnel. The legislature performed its task as dexterously as it could, but some glass was broken; and the court, whose duty is to preserve and not to destroy, could save the moneys-and-credits act in part only.

The origin of this case and the question involved have been stated. The answer to the question has been indicated in the discussion of the Voran case.

There is an old philosophical premise about the essence of things. The essence of a thing is its true nature, which classifies it. Speculative reasoning from the premise led to some absurdities, but the premise may be accepted as sound. The name of a thing does not change its nature. If the taxable animal has long ears, and brays instead of neighs, its essence will not be changed by putting on it the label "a horse." In one case the court was asked to perform a feat of verbal acrobatics and call an oil refinery a branch penitentiary. (*The State v. Kelly,* 71 Kan. 811, 81 Pac. 450.) In taxation we penetrate to essence; and if, in final analysis, that which is assessed and taxed consists intrinsically of intangibles, the burden of taxation may not be made greater by sticking in the bark of terminology.

As indicated, the standard for valuing shares of stock assessed to stockholders, established by the statute interpreted in the Geary county case, was true value:

"The value of all tangible assets of every kind, including the value of all real estate owned, should be considered. Intangible elements of value—rights, privileges, good will, capacity and opportunity to achieve financial success, results of past business and the outlook for the future—should be considered. In a word, the entire potentiality of the corporation to profit by the exercise of its corporate franchises should be taken into account." (*Bank v. Geary County,* 102 Kan. 334, 343, 170 Pac. 33.)

The present statute reads as follows:

"Shares of stock issued by national banks and by state banks and savings banks, or other banking organizations, and by loan and trust companies, located in this state, shall be assessed to the individual shareholders at the place where the particular bank or loan and trust company is located. The president, cashier or other managing officer of each and every institution of the kind named herein which has issued shares of stock shall furnish to the assessing officer, upon demand, during the month of March of each year, a list of all the shareholders and of the number of shares owned by each share-

holder, and the assessing officer shall list to each shareholder for taxation purposes the assessable value of such shares as hereinafter provided. To aid the assessor in fixing the value of such shares, the returning officer shall furnish to the assessor, under oath, a statement correctly showing the amounts of capital stock, surplus and undivided profits as of March first of the current tax year. By undivided profits is meant all earnings of the institution which have not been carried to surplus or paid out in dividends under whatever account carried, whether as undivided profits, exchange, interest, stockholders' account, or other account representing interests of the shareholders. The assessor from such statement shall base his valuation upon the capital, surplus, and undivided profits, the latter ascertained as provided herein, unless an investigation shall show incorrect returns, in which case he shall determine what returns should have been made to correspond with the facts disclosed by the investigation, and shall revise the returns and use such revised returns as the basis of the assessment; . . ." (Laws 1925, ch. 276, § 1.)

Analyzing this statute, it will be observed that provision for taxing shares of stock at their true value was stricken from the law. According to all rules for interpreting legislative action, this was done intentionally, and the assessor was required to base valuation on capital, surplus, and undivided profits. Aid to the assessor was provided for. This aid consisted in furnishing him with a list of names and a list of figures for doing a sum. Items to be included in undivided profits were specified, covering every account on the books representing "interests of shareholders." Shareholders have no property interest in undivided profits. Exchange, interest and earnings hidden from taxation in stockholders' accounts all belong to the bank. If the "return" should be incorrect, the assessor was given authority to correct it; that is, to make it show true capital, surplus, and undivided profits. The assessor was then directed to use the revised return as the basis for assessment; and he was given no authority to take into account anything but the sum of capital, surplus, and undivided profits. Perhaps experience had demonstrated it was unwise to give assessors freedom to value bank shares. If one bank does not belong to our financial group, or does not support our candidate, it may have its taxes raised. The practice in valuing bank shares corresponds to the statute, and the former method of valuing a share of stock, the individual property of the shareholder, comes near to being a Hamlet performance with Hamlet out of the cast.

The statute provides for deduction from gross valuation of capital stock, surplus and undivided profits of real estate up to a certain amount, and the real estate is taxed to the bank under the gen-

eral law. The assessed value, not the actual value, of the real estate is deducted. The net valuation thus ascertained is apportioned among stockholders. Getting our feet on the ground again, the law is a property-tax law. No jugglery with method of listing and valuation can change that fact. The result is, net valuation set off to stockholders finally rests on intangibles, and rests on intangibles to such an engrossing extent that, for purpose of practical administration of the law, they characterize the valuation.

After rate has been applied to assessed valuation, the bank pays the tax. The bank absorbs the tax, deducts the amount in making its federal income-tax return, and it may be difficult for the uninitiated to see how, under the statute, shareholders can be taxpayers. They do, however, pay the tax on shares of stock in a sense which fully satisfies the state and federal law. It is not necessary to demonstrate the fact here. The important question is, What is the essence of the burden which they bear?

The books are full of cases which say that if by varying form substance may be changed, little would remain of constitutional limitations. Constitutional provisions cannot be evaded in that way. We are not to be deceived when the hand is the hairy hand of Esau, but the speaking voice is the voice of Jacob; and an intangible valuation set off to one person for payment of taxes may not be given a rate of $3.50 per $100, while persons owning intangibles pay only 50 cents per $100.

Since by going to the bottom of the matter we find that the ultimate subject of taxation is intangibles, reached for taxation through shareholders, it is not material that a share of bank stock, regarded simply as a share of bank stock, is not mineral, nor money, nor mortgage, nor note, nor evidence of debt.

This disposes of the case, and disposes of the case of *Malinda Cratts v. C. J. Houston*, as county treasurer of Reno county, which is of the same nature as this one, but involves tangible personal property.

The writs have been denied.

JOHNSTON, C. J., MARSHALL, DAWSON, HUTCHISON and JOCHEMS, JJ., concurring.

HARVEY, J. [dissenting opinion filed April 10 (286 Pac. 673)]: In expressing my views in this case I shall lay to one side, as much as that can be done, such expressions in the opinion as "syllogistic

seven-league boots," "the gingham dog and the calico cat," references to the animal that "brays instead of neighs," and "the hairy hand . . . of Esau," for I have a firm conviction that such acrobatic intellectual feats have no place in a judicial opinion. Referring to the speed of this case in this court, it is my view that had more time been taken by counsel, sincerely representing interests to be affected, in the preparation of pleadings and of briefs, and had more time been given by this court to the consideration of the questions involved, the decision would have been different. It is current history that questions pertaining to taxation have received more than usual attention in this state in recent years. The decisions of the federal courts in the case of *Central Nat. Bank v. McFarland,* 20 F. (2d) 416, and 26 F. (2d) 890; the appointment, work and report of the tax code commission, provided by chapter 282 of the Laws of 1929, and the two decisions of this court in *Voran v. Wright,* 129 Kan. 1, 601, 281 Pac. 938, and 284 Pac. 807, brought about a special session of the legislature, which was in progress when this action was brought and determined. Opposing influential political and financial groups, apparently almost equal in legislative strength, were contending over pending legislative measures. It is no secret that this action was hurriedly brought and an early decision sought with the view of having the ruling of this court influence pending legislation. This accounts largely for the speed in the presentation and disposition of the case. I regard it as a fitting illustration of the fact that too much speed in judicial function may be as detrimental as too great delay. The opinion of the court is predicated, in part at least, on the theory that certain rather obvious conclusions "would wreck the tax system of the state and plunge the state into financial chaos." Permit me to express the view that nothing will wreck the tax system of our state more effectively than hurried, ill-considered decisions in tax cases by a court of last resort, and that our state will get out of financial chaos more rapidly when, in an action before us, we construe the constitutional and statutory provisions in question in harmony with well-established legal authority. With these general remarks let us look at the decision before us.

The legal principle determined, as stated in the syllabus, is:

"Shares of state bank stock assessed to shareholders take the intangible rate of taxation because, disregarding form and regarding substance only, the foundation for the tax burden which shareholders must bear consists essentially of intangibles which are classifiable under the amended constitution and which have been classified and given a low rate by the legislature."

This is an antiquated theory which has long since been disapproved by the courts and by legal authors. In 26 A. & E. Ency. of L., 2d ed., 826, it is said:

"It has been said that shares of stock are property. Their status as such has finally been fixed as personalty, irrespective of whether the property of the corporation is realty or personalty, tangible or intangible. This result has not been reached without some conflict of judicial opinion, and in several jurisdictions the present state of the law is the result of legislative interference in direct opposition to the courts. Some of the older authorities hold that shares are realty or personalty according to the nature of the corporate capacity and enterprise. . . . But these decisions are practically obsolete and possess chiefly an historical interest. It is now settled that stock is personal property."

In 14 C. J. 387 it is said:

"Contrary to early opinion in the case of corporations owning real estate, it is now very generally agreed that shares of stock in corporations are personal property, whether they are declared to be such by statute, as is sometimes the case, or not, and whether the property of the corporation itself is real, as in the case of mining companies, land companies, railroad companies, canal companies, and the like, or only personal."

In 7 R. C. L. 166 it is said:

"The tangible property of a corporation and the shares of stock therein are separate and distinct kinds of property and belong to different owners—the first being the property of the artificial person—the corporation—the latter the property of the individual owner."

In 5 Thompson on Corporations, 3d ed., § 3476, it is said:

"The earlier decisions inclined to the view that the shares of stock of a corporation partook of the nature of its property. . . . But this view is now discarded and it is the general, if not universal, rule that shares of stock are personal property . . . The reason of the rule is that the ownership of the shares gives no right, title or interest in the tangible property of the corporation. . . . Corporate stock contains the three elements essential to the right of property—the legal title, beneficiary interest in it and the right of control over it."

This view of the nature of corporate stock is applied in the taxation of shares of stock in banks. In *Van Allen v. The Assessors*, 3 Wall (70 U. S.) 573, 18 L. Ed. 229, the stockholders of the First National Bank of Albany, N. Y., in an action against the board of assessors of taxes, contended that because the capital of the bank was invested in stocks and bonds issued by the United States, the shares of the bank held by the plaintiffs as stockholders were not subject to assessment and taxation by state authority. The court held against that view. In the opinion, after stating many pro-

visions of the national bank act of February 25, 1863, as amended and reënacted by the act of June 3, 1864, and after expressing the view that the tax which the state is authorized to impose on the shares of stock is a condition for the rights and privileges conferred by these acts, this language is used:

"But in addition to this view, the tax on the shares is not a tax on the capital of the bank. The corporation is the legal owner of all the property of the bank, real and personal; and within the powers conferred upon it by the charter, and for the purposes for which it was created, can deal with the corporate property as absolutely as a private individual can deal with his own. This is familiar law, and will be found in every work that may be opened on the subject of corporations. . . . The interest of the shareholder entitles him to participate in the net profits earned by the bank in the employment of its capital, during the existence of its charter, in proportion to the number of his shares; and, upon its dissolution or termination, to his proportion of the property that may remain of the corporation after the payment of its debts. This is a distinct independent interest or property, held by the shareholder like any other property that may belong to him. Now, it is this interest which the act of congress has left subject to taxation by the states. . . ." (p. 583.)

The following cases, treating varied phases of the subject, are to the same effect (I have not attempted to make the list complete): *Farrington v. Tennessee*, 95 U. S. 679; *Davidson v. New Orleans*, 96 U. S. 97; *Bank of Commerce v. Tennessee*, 161 U. S. 134; *Owensboro National Bank v. Owensboro*, 173 U. S. 664; *Cleveland Trust Co. v. Lander*, 184 U. S. 111; *Delaware L., &c., R. R. Co. v. Pennsylvania*, 198 U. S. 341; *Hawley v. Malden*, 232 U. S. 1; *St. Louis S. W. Ry. Co. v. Arkansas*, 235 U. S. 350; *Rogers v. Hennepin County*, 240 U. S. 184; *Hager v. American Nat. Bank*, 159 Fed. 396; *Charleston Nat. Bank v. Melton*, 171 Fed. 743; *Eliot Nat. Bank v. Gill*, 210 Fed. 933; *National Bank of Commerce v. Allen*, 223 Fed. 472; *First Nat. Bank v. Durr*, 246 Fed. 163; *Hannan v. First Nat. Bank*, 269 Fed. 527; *Hoglan v. Moore*, 219 Ala. 497; *Roberts v. Automobile Ins. Co.*, 89 Conn. 181; *Georgia B. & L. Asso. v. Savannah*, 109 Ga. 63; *MacLeod v. Stelle*, 43 Ida. 64; *Illinois Nat. Bank v. Kinsella*, 201 Ill. 31; *The People v. Toluca State Bank*, 327 Ill. 638; *Head v. Board*, 170 Ia. 300; *Deposit Bank of Owensboro v. Daveiss Co., etc.*, 102 Ky. 174; *Commonwealth v. Muir*, 170 Ky. 435; *Bellows Falls Power Co. v. Commonwealth*, 222 Mass. 51; *Hayes v. Union Trust Co.*, 317 Mo. 1028; *Montana Nat. Bank v. Yellowstone County*, 78 Mont. 62; *Brown v. Jackson*, 179 N. C. 363; *Ward County v. Baird*, 55 N. D. 670; *Shields v. Williams*, 159 Tenn. 349; *Stone v. Wisconsin Tax Comm.*, 197 Wis. 71.

The prior decisions of this court are in harmony with the above authorities: *National Bank v. Fisher,* 45 Kan. 726, 26 Pac. 482; *Comm'rs of Stafford Co. v. National Bank,* 48 Kan. 561, 30 Pac. 22; *Morbach v. Mining Co.,* 53 Kan. 731, 37 Pac. 122; *Mulvane v. O'Brien,* 58 Kan. 463, 49 Pac. 607; *Bank v. Lyman,* 59 Kan. 410, 53 Pac. 125; *Hunt v. Allen County,* 82 Kan. 824, 109 Pac. 106; *Building Co. v. Saline County,* 98 Kan. 732, 160 Pac. 971; *Bank v. Geary County,* 102 Kan. 334, 170 Pac. 33; *Woodard v. Timms,* 113 Kan. 413, 215 Pac. 456; *Ranchmen's Trust Co. v. Duncan,* 114 Kan. 308, 219 Pac. 523.

The result is that the principle of law stated in the syllabus of the court in this case is not supported by the authorities. Indeed, no authorities are cited in support of it. It stands, if at all, as the fiat of a court of last resort.

In the opinion it was said:

"The problem for solution in *Voran v. Wright* involves application of the intangible rate in taxation of shares of state bank stock. The relation of the intangible rate to the general tax law of the state was not involved, and the question presented in this case was not decided." (p. 252.)

I must confess that to me the two opinions of the court in the Voran case, *supra,* are unduly prolix, and I have had difficulty in determining just what was decided by them, and why. But as I do understand them, the statement just quoted from the opinion in this case is correct in part only. It is true that the specific question in the Voran case pertained to the rate of tax on shares of stock in state banks; but preliminary to the determination of that question the court considered the rate of tax on shares of stock of national banks, quoted our amended constitutional provision (art. 11, § 1), the federal statute (R. S. 5219), referred to and considered chapter 276 of the Laws of 1925, for the assessment of shares of bank stock, chapter 273 of the Laws of 1925, providing a registration fee tax upon real-estate mortgages; also chapters 277 and 278 of the Laws of 1925, and chapter 326 of the Laws of 1927, classifying and taxing money and credits, and in effect approved the holding of the federal courts in *Central Nat. Bank v. McFarland,* supra, that the shares of stock of national banks could not be taxed at a greater rate than that provided by those statutes (Laws of 1925, ch. 273, 277 and 278; Laws of 1927, ch. 326). The opinion states that the decision of the federal court which "relieves the stockholders of national banks from the obligation of paying the *ad valorem* [general] rate of tax

[which relief or exemption] is one of the discriminations plead and urged by the plaintiff as unjust, capricious and unreasonable" (129 Kan. 9, 609, 281 Pac. 942, 284 Pac. 811), and as to that it was said:

"The stockholders of the national banks are [now] relieved from the payment of the *ad valorem* [general] rate of taxation because of discrimination in violation of section 5219 [of the] federal statutes. They would [will doubtless] continue to adhere to that favorable ruling, and, whether right or wrong, their failure to pay would make a discrimination between them and the stockholders of state banks." (129 Kan. 9, 610, 281 Pac. 942, 284 Pac. 811.)

The same thought was expressed in different language in the separate opinion which dissented in part only from that of the court (p. 623). Hence, in addition to determining the rate of tax on shares of stock of state banks, the court did in fact determine the rate of tax on shares of stock of national banks, and on this point all of the members of the court were in accord. Further, in determining the specific question before the court in *Voran v. Wright*, supra, the court considered and determined the place of shares of bank stock in the scheme of taxation provided by the constitution and laws of this state. The opinion (p. 607) quotes our amended constitutional provision (§ 1, art. 11) and says:

". . . The only classification authorized or tolerated by this constitutional provision is that of property, . . . and every classification is now limited to property, . . . and only four kinds of property, viz., mineral products, money, mortgages, notes and other evidence of debt."

And on page 612:

"It is not seriously contended by anyone that shares of stock are within the definition given in the statute of money or credits [Laws 1927, ch. 326], neither do they come under the heading of notes or other evidence of debt. They simply represent the proportionate interest of the holder in the earnings and the final disposition of the assets of the company, . . . (7 R. C. L. 304.)"

The same thought, in different language, is expressed in the separate opinion (p. 621). It was therefore determined by the opinion that shares of stock in banks constitute property of a kind which the legislature was not authorized to classify by the amended provision of our constitution, and on this point all of the members of the court were in accord. The opinion also (p. 613) deals with the term "uniform and equal" as used in our constitutional provision with respect to property which the legislature is not authorized to classify, and cites opinions written by Judge Brewer and other

opinions of this court holding that the rate of tax on property not subject to classification by the legislature must be uniform and equal, and that same thought is expressed in different language in the separate opinion (p. 621). Hence all of the members of the court were in accord on that point. It is true that the rate of tax on real estate, and such personal property as household goods, was not directly before the court, and the opinion of the court did not specifically mention those matters; but the opinion did locate shares of bank stock as property which the legislature was not authorized to classify for the purpose of taxation, and in that group of property in which real estate, household goods, live stock, and all property in the state which bears the general-property rate, is placed by our constitution (art. 11, § 1), and which the legislature is not authorized to classify for the purpose of taxation. I knew that the question of the rate to be applied to real property or household goods was not the specific question before the court, and in my separate opinion, after giving my views on the specific question before the court, I stated, as my own views, a few observations (p. 623). Had I been writing the opinion of the court perhaps I would not have stated them, because they were not the specific questions before the court, but writing my separate views I thought the observations not inappropriate, and I did not understand, either from the opinions of the court or from our consultations, that the views so expressed differed materially from those entertained by the other members of the court.

In the opinion of the court it is said:

"In this state the difficulty arises in the adjustment of taxation, placed in constitutional strait-jacket when life was simple, to the complexities and heterogeneities of a highly developed, progressive, industrial society." (p. 253.)

I pass the question whether at the time our constitution was framed life was more simple than it is now; a question which is debatable at least, for if I have correctly read the early history of our state there were a good many "complexities and heterogeneities" in those days. One thing is sure—questions relating to taxation were neither new nor simple. They had received the careful study of students of government for many years. Some earlier state constitutions had provisions similar to the one placed in ours, others did not. No doubt the relative merits of these provisions were considered. In our constitutional convention were a number of able men, well informed as to the constitutional history of the

states. (See appendices C to D-2, Wyandotte Constitutional Convention.) If, by writing into our constitution "The legislature shall provide a uniform and equal rate of assessment and taxation" they placed the subject of taxation in a "constitutional strait-jacket," they did so intentionally and for a reason. They thought best to substitute the "constitutional strait-jacket" for (to use a similar illustration) the legislative wire fence through, under or over which a taxpayer, or group of taxpayers, might pass with comparative ease from a field where they were required to pay taxes on a par with their neighbors to one where they would have an advantage over them in matters of taxation. It had the merit at least of tending to stabilize laws imposing tax burdens—a thing much to be desired. That it was not thoroughly destructive is demonstrated by the fact that it was unchanged for more than sixty years, and within that time, I like to think and believe it to be true, our state and its people have made unexcelled progress in many of those elements regarded as essential to an improved civilization. The virtues of the modification of this provision by the amendment of 1924, or of other modifications proposed, remain to be demonstrated.

In the opinion of the court much is made of the fact that the law (Laws 1891, ch. 84) pertaining to the valuation of shares of bank stock for the purpose of taxation, was changed after the decision of *Bank v. Geary County,* supra, by taking out the requirement that they be assessed at their "true value" (Laws of 1919, ch. 306), as indicating a legislative intent to tax the property of the bank, rather than to value the shares of stock for the purpose of taxation. In my judgment it evidences no such legislative intent. Our first statute for the general incorporation of state banks (Laws 1891, ch. 43) created the office of bank commissioner, and among other things provided that he make biennial reports to the governor. In his fourth biennial report (1897-'98) the bank commissioner, in his legislative recommendations, said (p. 12):

"Our system of assessing banks is defective. Our law is indefinite and conflicting, and is construed differently by many assessors, thus resulting in unequal taxation, in many instances banks being required to pay excessive taxes, out of all proportion to other property, while in other cases they avoid paying their just portion. Our assessment law should be amended so as to provide a uniform and just basis for the assessment of banks, requiring them to bear only their just shares of the burden of taxation."

This was repeated, or a similar statement made, in later reports. The state tax commission was created by chapter 408 of the Laws of 1907. Its personnel included Samuel T. Howe, an exceptionally able authority on all questions pertaining to taxation, and W. S. Glass, an able lawyer and formerly a district judge. The tax commission prepared a blank form for the assessment of the shares of stock in banks, and had a meeting with a committee appointed by the president of the State Bankers Association with respect to uniform assessment of banks, which committee was to report to the president and he to the members of the association. In the first report to the governor (Oct. 15, 1908), at pages 136 to 140, are decisions of the tax commission on seven bank assessment cases appealed to the commission. One question common to the cases was whether the "actual value" of bank or trust company stock is measured by what is commonly called the "book value"; that is, the combined value of· the capital stock, surplus and undivided profits as shown by the books of the bank. On this point the tax commission held that the presumption was that the "book value" was the "actual value" in money of the aggregate shares of stock, and that this presumption was such that it would not be slightly overcome—even by proof of sales of a few shares at a different value. In the appeals involving the taxation of shares of stock in national banks our statutes pertaining to the assessment of shares of bank stock, and the federal statute (R. S. 5219) were referred to, and it was held "that the shares of state banks shall be taxed at the same rate as are the shares of national banks." By August, 1917, several questions on which different views were entertained had arisen concerning the valuation of shares of bank stock, and on the initiative of the tax commission (6th Biennial Report of Tax Commission, p. 159) a suit was filed in this court to have these questions determined. This is the case of *Bank v. Geary County,* supra, in which it. was held (syl. 2) that the shares were to be assessed at their "true value." The practical effect of that was to weaken the strong presumption entertained and applied by the tax commission that the true value of the shares was the "book value," and to strengthen the authority of local assessors in determining the "true value" of such shares. In other words, it tended to restore the unsatisfactory conditions of which the bank commissioners had complained, and which the tax commission had endeavored to overcome. The next session of the legislature (Laws 1919, ch. 306)

sought to overcome the condition brought about by the decision of the court on this point. The words "true value" were taken out, and the statute was amended for the assessment of the shares to the individual shareholders, and for basing the value of the shares on the capital, surplus and undivided profits, thereby establishing by statute the method of valuing such shares which had been used by the tax commission for about ten years before the court decision just mentioned. From this change in the statute there is no sound basis to conclude that the legislature was changing the basis of taxation from taxing shares of stock to the taxing of the property of the corporation. Certainly, as to national banks, such a change would not be tolerated under the federal statute (R. S. 5219), and our state statute placed the valuation of shares of stock of state and national banks on the same basis, as had been done in prior statutes. The statute as amended made it clear that the valuation to be determined for the purposes of taxation was of the shares of stock.

The opinion argues that § 2 of art. 11 of our original constitution was ignored by the legislature for years prior to its repeal in 1924, for the reason that to enforce it would make such a burden on incorporated state banks as to put them out of business. I question the soundness of this argument, although other similar references, by way of illustration or argument, have been made in previous decisions. (*Dutton v. National Bank*, 53 Kan. 440, 454, 36 Pac. 719; *Bank v. Lyon County*, 83 Kan. 376, 379, 111 Pac. 496; *Wheeler v. Weightman*, 96 Kan. 50, 69, 149 Pac. 977; *Bank v. Geary County*, 102 Kan. 334, 339, 170 Pac. 33.) The only case in which the decision is based on this section is *Knox v. Comm'rs of Shawnee County*, 20 Kan. 596, involving the tax on the property of private bankers, under section 23 of chapter 34 of the Laws of 1876, where this section of our constitution is quoted, and it is said:

"In this legislation the legislature has but followed the express mandate of the constitution." (p. 598.)

But since the section of the statute for taxing private bankers, then under consideration, was drawn on the same plan as section 17 of the same act applying to the property of merchants and manufacturers, authorized by section 1, article 11, of our constitution, no reason suggests itself why the statute then under consideration would not have been held valid under section 1, article 11, if that point had been urged. It is my view that section 2, article 11, never

became effective as a part of our constitution for the same reasons that article 13 of our constitution, relating to "Banks and Currency," never became effective. Although still "printed in the law books," article 13 applied to banks of issue only. No banks of issue were ever incorporated under the laws of this state. (*Pape v. Capitol Bank*, 20 Kan. 440.) There were no national banks in Kansas at the time our constitution was framed in July, 1859, nor at the time the state under it was admitted into the union, January 29, 1861. The first congress, by the act of February 25, 1791 (1 U. S. Stat. at L. 191), incorporated "The Subscribers to the Bank of the United States," but this corporation, by the terms of the act creating it, expired March 4, 1811. By the act of April 10, 1816 (3 U. S. Stat. at L. 266), congress incorporated "The Subscribers to the Bank of the United States," which, by the terms of the act, was to continue until March 3, 1836, and for two years longer for purposes of liquidation, which time was later extended as to actions pending. At the expiration of the time for which it was incorporated the bank was reorganized under a statute of the state of Pennsylvania. The only other banks incorporated by acts of congress prior to the adoption of our constitution were banks for the District of Columbia, of which the acts found in 5 U. S. Statutes at Large, 1, 4, 69, are typical, and acts approving territorial acts incorporating banks, of which the act of March 3, 1837, is typical. Our territorial legislature had incorporated three banks of issue (Laws 1857, p. 103; Private Laws 1858, chs. 60, 61, 62). At least one of these continued to function after statehood. (Comp. Laws 1862, ch. 129). Perhaps our constitutional provisions specifically relating to banks were applicable to territorial banks of issue which continued as such after statehood, but if so, those were the only banks to which they were applicable. At the time our constitution was framed state banks, generally speaking, were banks of issue, as well as banks of deposit and of discount; that is, they issued their own notes payable on demand, which were designed to and did circulate as currency. This is the kind of banks known to the framers of our constitution, and the kind they must have had in mind when they framed the specific provisions of our constitution relating to banks (art. 11, § 2, and art. 13). In *Pape v. Capitol Bank*, supra, this was held to be true with respect to all of the sections of article 13, although several of them are in general language. Soon after

the framing of our constitution the United States became engaged in the civil war and found itself in need of a national currency. Broadly speaking, the need was twofold: *First,* the currency in use throughout the United States consisted, almost exclusively, of the circulating notes of state banks, private banks, and some other firms and corporations, including some municipal corporations. Many of those who had issued such notes were or became insolvent, or for some reason ceased payment. The result was financial confusion. A stable national currency was needed. *Second,* the federal government needed to finance itself to care for its greatly increased expenditures, made necessary by the civil war, and for this purpose it was deemed prudent to issue bonds of the federal government and to find a market for them at home. To accomplish these purposes congress passed the act of February 25, 1863 (12 Stat. 665), which was greatly revised and reënacted by the act of June 3, 1864 (13 Stat. 99), entitled "An act to provide a national currency secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof." This was later designated "The national bank act" (of June 20, 1874), and with amendments, including the federal reserve act (38 Stat. 251), constitute the present federal statutes pertaining to national banks (U. S. C. A., title 12). The act provided a national currency in the form of bank notes to be put into circulation by, and redeemed through, banking associations organized under the provisions of the act, each bank securing its circulating notes by bonds of the United States deposited with the comptroller of the currency. State banks of issue were required to report the amount of their circulating notes to the comptroller of the currency. By an internal revenue act a duty was placed on the circulating notes of state banks, which was soon increased to 10 per cent. The effect of this was to compel state banks to cease to be banks of issue, also to render nugatory our constitutional provisions specifically relating to banks. Our first state legislature (Laws 1861, ch. 4) passed "An act to authorize the business of banking," a comprehensive measure of forty-three sections. It provided for the incorporation of banks of issue of circulating notes payable in "lawful money of the United States," which the auditor of state was to cause to be engraved and printed, and which were to be secured by a deposit of "public stocks issued . . . by the United States, or . . . the state of Kansas." The certificate

of incorporation was to be filed with the state auditor. This statute was to be submitted to the vote of the people at the next general election, as provided by the constitution (art. 13, § 8), and was to be in force after the approval of the majority of the votes cast at such election. It was submitted at the general election in November, 1861, received a majority of the votes cast on the question, and a proclamation of its approval was published in December, 1861 (Public Documents, Kansas, 1862, p. 12). Speaking of this law, it is said, in Blackmar's Kansas History, vol. 1, p. 139: "Before it could fairly be tested congress passed the national banking law, and the banks of Kansas were confined to institutions of discount and deposit"; and in Boyle's Financial History of Kansas, p. 48: "This system, of course, did not have time to develop to any great extent before the national banking system was introduced by the federal government, driving out of circulation the notes of state banks by a 10 per cent tax." Neither the printed reports of the state auditor nor the records of his office show the certificate of incorporation of any bank under this statute. The auditor's reports show the amount of state bonds held and amount of circulating notes outstanding of the Lawrence bank, December 31, 1861, also December 31, 1862 (Kansas Public Documents, 1862, p. 58; 1863, p. 65), but this appears to have been one of the banks incorporated by the territorial legislature (Private Laws, 1858, ch. 62). By chapter 81, Laws of 1861, it was made lawful for any bank of the state which had deposited bonds of the state of Kansas, or of the United States, with the state auditor, as a banking basis, to suspend specie payment in the redemption of its circulating notes until July 1, 1862. Neither chapter 4 nor chapter 81, Laws of 1861, was printed or referred to in the Compiled Laws of Kansas of 1862, or in any subsequent compilation of our statutes. In *Pape v. Capitol Bank*, supra, after quoting section 8 of article 11 of the constitution, which required the submitting of banking laws to a vote, it was said (p. 442): "No banking law, it is conceded, has ever been submitted to a proper vote." I can reconcile this statement with the vote and proclamation of approval of chapter 4, Laws of 1861, above mentioned, only on the theory that it had been determined in some way, and for some reason, that the vote on this measure was not proper. In any event, it seems clear that the statute (Laws of 1861, ch. 4) never became an effective measure for the organization of state banks. I have taken the time to give the history of this statute

as further evidence that the framers of our constitution had in mind banks of issue only when they wrote the specific provisions into our constitution (art. 11, § 2, and art. 13) relating to banks. The first effective statute for incorporating banks of any character in this state was passed in 1868 (ch. 23, art. 16), and that related to savings banks only. A number of banks were incorporated under the savings-bank statute, inappropriate as it was for that purpose, but none of those was organized prior to 1868. The first general statute for incorporating state banks, as we know them now, was passed in 1891. (Laws 1891, ch. 43; see *Blaker v. Hood,* 53 Kan. 499, 507, 36 Pac. 1115.) This accords with my own research, and with the view expressed in *West v. Bank,* 66 Kan. 524, 72 Pac. 252, where it was said:

"At the time of the passage of the act· of 1891 there was no banking law on the statute book, except the savings-bank act under which plaintiff had organized and a penal statute . . ." (p. 535.)

If my views on this are correct, there is no merit to the argument in the opinion of the court that the legislature for years ignored section 2, article 11 of the constitution because "The legislature encountered the tough economic fact that to do so would kill off state banks," for the reason that there never were any incorporated state banks of the kind provided for by our constitution and in the contemplation of its framers. Neither is there any foundation for the statement in the opinion ". . . that section 2 of article 11 of the constitution . . . prescribed in detail a method for taxing banks. A tax law was framed according to the constitution, and state banks were organized and employed property in the business of banking. Then came the national banking system. . . ." There were no state banks organized under the law of this state prior to the coming of the national banking system, and hence no tax laws were framed that could apply to them. I realize that what was said in the opinion on this subject was by way of argument. I think the argument unsound. But whether one prefers the argument of the opinion of the court on this point, or the views here expressed, is not vital to the decision of this case. This case must be determined under our present constitution, which does not include section 2, article 11, of our original constitution.

In the early history of our state, banking business was done entirely by private banks, except such as was done by the one or two banks of issue incorporated by private territorial acts, which per-

haps continued to do business for a year or two after statehood. After the acts of congress for the incorporation of national banking associations (I have no data as to the organization of the first national banks in this state, but it could not have been before 1863), the banking business was done by private banks and national banks until 1868, after which time a number of banks were organized under the savings-bank statute (G. S. 1868, ch. 23, art. 16). From 1868 to 1891 the kinds of banks in this state were national banks, banks organized under the savings bank statute, and private banks. Prior to 1891 no serious effort was made in this state for the state supervision of the business of banking. In Boyle's Financial History of Kansas, p. 96, it is said: ". . . the state made no attempt to regulate the business of banking prior to the passage of the banking law of 1891." On the first call for reports by the bank commissioner, October 13, 1891, 249 state banks and 165 private banks reported. As late as the fifth biennial report (1899-1900) complaint was made by the bank commissioner of individuals and firms doing a private banking business without reporting to the commissioner. That report showed 333 state banks and 55 private reporting on the call of September 1, 1900, 4 banks doing an exclusive savings bank business, and 110 national banks reporting to the comptroller of the currency on the call of September 5, 1900.

Let us now examine our tax laws in so far as they pertain to the taxation of banks. Our state (Comp. Laws 1862, ch. 197) appears to have carried over the latest general territorial statute (Laws 1860, ch. 114) providing for the assessment and collection of taxes. It defines (§ 3) personal property to include all goods and chattels of every tangible thing being the subject of ownership; moneys and effects; all debts due, or to become due, from solvent debtors, whether on account, contract, note, mortgage, or otherwise; all public stock and stock or shares in all banks or incorporated companies, and such portion of the capital of incorporated companies liable to taxation on their capital as shall not be invested in real estate. A comprehensive act relating to assessment and taxation (Laws 1866, ch. 118) contained a similar provision, apparently not taking into consideration the provisions of the federal statute of June 3, 1864 (R. S. 5219), respecting the taxation of national banking associations. Section 18 related to banks incorporated by the laws of the state "having the right to issue bills for circulation as money," and provided for the taxation of the average amount of

bills and notes, and of moneys, effects and dues, deducting specie kept to redeem circulation and to meet accruing liabilities to depositors. These statutes could have no effect, of course, so far as incorporated state banks were concerned, for the reason that there were then no incorporated state banks. In 1868 the legislature passed a revised comprehensive act for the assessment and collection of taxes (G. S. 1868, ch. 107), in which, for the first time in our tax laws, banks organized under the laws of the United States are mentioned, and an article was inserted relating specifically to banks and bankers. It provided (§ 23):

"Stockholders in banks and banking associations organized under the laws of this state or of the United States, shall be assessed and taxed on the value of their shares of stock therein in the city or township where such bank or banking association is located, and not elsewhere, whether such stockholders reside in such city or township or not, but *not at any greater rate than other moneyed capital in the hands of individuals in this state.*" (Italics ours.)

This italicized wording obviously was taken from the federal statute (R. S. 5219).

Provision was made for valuing such shares. There is nothing in this section to indicate that the state banks referred to were banks of issue only, and the same legislature provided for the incorporation of state savings banks (G. S. 1868, ch. 23, art. 16). Section 27, chapter 107, provided that banks incorporated under the laws of this state (note that national banks were omitted), and every person or firm engaged in the business of banking, should be taxed on the average amount of notes and bills discounted, and the average amount of moneys, effects or dues of every description belonging to the bank; but the average amount of specie fund, unemployed except for "redeeming its circulation" (which could apply to banks of issue only) and meeting its accruing liabilities to depositors, and amounts due from other banks, shall be excluded in estimating the taxable property of the bank. It would seem that this section could apply only to persons and firms engaged in banking, for there was then no statute for the incorporation of state banks of any character, and neither at that session nor since has any statute been enacted for the incorporation of state banks of issue. In 1876 the legislature made a general revision of the statute to provide for the assessment and collection of taxes (Laws 1876, ch. 34), in which it was provided (§ 22):

"Stockholders in banks and banking associations, organized under the

laws of this state, or of the United States, shall be assessed and taxed on the true value of their shares of stock, . . . *And provided further,* That banking stock or capital shall not be assessed at any higher rate than other property."

This section was amended by chapter 84 of the Laws of 1891, which was amended by chapter 306 of the Laws of 1919 (R. S. 79-1101), which was amended by chapter 276 of the Laws of 1925. All of these amendments, so far as here pertinent, relate to the manner of valuing the shares of stock for the purpose of taxation. All of the statutes, beginning with that of 1868, provided for the assessment of shares of stock of state banks for the purpose of taxation upon the same basis as shares of stock in national banks.

Section 23 (Laws 1876, ch. 34) reads:

"Every private bank, banker, broker, building, loan and trust association shall list and return the average amount of capital invested in such business during the year. . . ."

This section was amended by chapter 39 of the Laws of 1879. In *Knox v. Comm'rs of Shawnee Co.,* 20 Kan. 596, it was held applicable to private banks. So far as my research has disclosed it never was adjudged applicable to incorporated banks. No doubt it was the statute, or one of them, which caused local assessors to entertain different views as to the method of assessing banks complained of by the bank commissioner and attempted to be corrected by the tax commission, as previously discussed. Beginning with our territorial statutes (Laws 1855, ch. 137), and all through statehood, our tax laws have provided for the taxation of money, notes, mortgages, and other evidence of debt—except that by chapter 140 of the Laws of 1873 real-estate mortgages were exempt from taxation; but that act was repealed by chapter 130 of the Laws of 1874. The tax laws of 1866 (ch. 118) defined the word "credit" (§ 3) and provided (§ 4) that *bona fide* debts owing by any taxpayer may be deducted from the gross amount of credits belonging to him, and that his personal-property statement need only set forth the credits less such deductions, and since then a similar provision has been in our statutes for the assessment and taxation of personal property. (See R. S. 79-303.) In carrying out our constitutional mandate, "The legislature shall provide for a uniform and equal rate of assessment and taxation" (art. 11, § 1), the legislature has enacted statutes as to what property is subject to taxation (R. S. 79-101), for the listing of personal property generally (R. S. 79-301 *et seq.*), and

of real estate (R. S. 79-401 *et seq.*), and for the valuation thereof (R. S. 79-501), and of the property of railroads (R. S. 79-601), telegraph, etc., companies (R. S. 79-701), express companies (R. S. 79-801), car companies (R. S. 79-901), the property of merchants and manufacturers (R. S. 79-1001), and of shares of stock issued by banks (R. S. 79-1101). The rate for each taxing district is determined and the tax levy made by the boards of county commissioners (R. S. 79-1802), working with the state tax commission, after all the taxable property has been listed and its value for purposes of taxation determined as provided by the various statutes relating to the listing and valuation of the various kinds of property. Prior to 1925 the rate of tax levied in each taxing district was uniform on all property and on all kinds of property listed and valued for tax purposes in such district. This uniformity of tax rate on all property in the taxing district was not only required by our constitution, and our statutes, but was enforced by the repeated decisions of this court. (*Hines et al. v. City of Leavenworth et al.,* 3 Kan. 186, 197; *Gulf Railroad Co. v. Morris,* 7 Kan. 210, 221; *Comm'rs of Ottawa Co. v. Nelson,* 19 Kan. 234; *Francis, Treas., v. A. T. & S. F. Rld. Co.,* 19 Kan. 303; *Graham v. Comm'rs of Chautauqua Co.,* 31 Kan. 473, 2 Pac. 549; *M. & M. Rly. Co. v. Champlin, Treas.,* 37 Kan. 682, 16 Pac. 222; *Mendenhall v. Burton,* 42 Kan. 570, 575, 22 Pac. 558; *Elevator Co. v. Stewart,* 50 Kan. 378, 383, 32 Pac. 33; *C. B. & Q. Rld. Co. v. Comm'rs of Atchison Co.,* 54 Kan. 781, 39 Pac. 1039; *In re Page,* 60 Kan. 842, 58 Pac. 478; *Hamilton v. Wilson,* 61 Kan. 511, 59 Pac. 1069; *Voran v. Wright,* 129 Kan. 12, 281 Pac. 934; 129 Kan. 613, 284 Pac. 813.)

When our constitution was amended in 1924 it retained the provision as to uniformity of rate of assessment and taxation as to all property which it did not authorize the legislature to classify and tax separately as to class. Before the amendment the provision read: "The legislature shall provide for a uniform and equal rate of assessment and taxation" (art. 11, § 1). The amendment added these words: "except that mineral products, money, mortgages, notes and other evidence of debt may be classified and taxed uniformly as to class as the legislature shall provide." (See Laws 1923, ch. 255.) Shares of stock issued by banks or other corporations are not "mineral products," nor are they "money," or "mortgages," or "notes or other evidence of debt." This was determined in *Voran v. Wright,* supra, in harmony with the authorities; and

counsel in their briefs in support of motions for rehearing in that case and in their briefs in this case conceded that adjudication to be correct. By this amended constitutional provision we have, broadly speaking, two classes of property in this state: First, property which the legislature is not authorized to classify and tax as to class; and, second, property which the legislature is so authorized to classify and tax. As to the first of these, the constitutional provision is now, as it always has been, that the legislature shall provide a uniform and equal rate of assessment and taxation. Since shares of stock issued by banks are not property of a kind which the legislature is authorized to classify and tax uniformly as to class, they necessarily remain in that general group of property respecting which the legislature shall provide a uniform and equal rate of assessment and taxation, along with personal property generally (see R. S. 79-301, 79-501), and real estate (see R. S. 79-401, 79-501), and the property of railroads (see R. S. 79-601), and of telegraph, etc., companies (see R. S. 79-701), and of express companies (see R. S. 79-801), and of car companies (see R. S. 79-901), and of property of merchants and manufacturers (see R. S. 79-1001), and of shares of stock issued by banks (see R. S. 79-1101 as amended by Laws 1925, ch. 276). These two general groups of property made by the amended constitutional provision were not formed by putting all tangible property in one group and all intangible property in another; for "mineral products" and "money," both tangible, and "mortgages" and "notes and other evidence of debt," both intangible, were placed in the group which the legislature was authorized to classify and tax as to class; while personal property generally, real estate, and the property of railroads, and of telegraph and similar companies, and of express companies, car companies, and of merchants and manufacturers, most of which is tangible, perhaps some intangible, and all shares of stock of banks and trust companies, which are intangible, were left in the group of property respecting which the legislature was directed to provide a uniform and equal rate of assessment and taxation. In other words, when the constitution was amended to take some property out of what has been termed "the constitutional strait-jacket," it took only certain specific kinds of property, which it named, and as to those authorized the legislature to classify and tax them as to class, and left all other taxable property to be taxed, as it had previously been taxed, at a uniform and equal rate. There

is, therefore, no ground for the view which seems to permeate the opinion of the court in this case that by this amendment the legislature was authorized to classify and separately tax intangible property. The language of the amended constitutional provision indicates that the legislature which drafted this provision knew what was determined in *Voran v. Wright,* supra, and what is conceded to be established law, that shares of stock in banks are not property of any of the kinds named in the amendment which the legislature could classify, and this view is strengthened by the language of subsequent statutes (Laws 1925, ch. 276; Laws 1925, chs. 277, 278, and Laws 1927, ch. 326), which clearly show that the legislature never attempted to separately classify and tax shares of bank stock. The only apparent legislative shortsightedness seems to be that it did not foresee the effect upon the legislation previously enacted, and then being enacted, of the application of the federal statutes (R. S. 5219).

It was argued in briefs for defendants in this case, and was argued in some of the briefs in support of post-opinion motions in the case of *Voran v. Wright,* supra, that if the shares of stock of national banks cannot be taxed at a rate greater than that provided by our intangible tax law, and shares of stock of state banks are taxed at the much higher general-property rate, and there is a discrimination between them for that reason, as was held in *Voran v. Wright,* supra, it does not follow that such discrimination is an unlawful one. It is argued, first, that the fact that the state does not and cannot tax the real property owned by the federal government, such as the military reservations at Fort Riley and Fort Leavenworth and the post-office buildings owned by the federal government in various cities throughout the state, and personal property owned by the federal government, such as military and postal equipment and supplies, does not prevent the state from taxing other real estate or personal property situated in the state and owned by individual citizens, firms or corporations; second, that national banks are incorporated under federal statutes and are federal agencies to accomplish necessary federal governmental purposes; that the federal government could prohibit the taxation of national banks, if it desired to do so, and the fact that the federal government permits the state to tax the real property of national banks as other real property in the state is taxed, and permits it to tax the shares of stock in national banks, is a permission granted by the

federal government to the states and does not prevent the state from taxing shares of stock in state banks at the general-property rate; and that no federal statute attempts to regulate the basis of taxation, or rate of tax, which a state may impose on real estate or personal property, such as household goods situated in the state. As to the first of these arguments, it may be noted that the federal government does not own the property of the national banks as it owns the military reservations and post-office buildings, and personal property mentioned. The right of a state to tax property of the federal government situated within the state—a debated one in the early history of our federal government—was settled, so far as our state was concerned, by the act of congress of January 29, 1861 (12 Stat. 127), admitting Kansas into the union. Our constitution, as originally prepared, had an "ordinance" preceding the preamble and "resolutions" following the schedule (Wyandotte Constitutional Convention, pp. 574, 591) containing conditions proposed, or requested, for the admission of the state into the union. The act of admission provided (§ 3):

"That nothing in this act shall be construed as an assent by congress to all or any of the propositions or claims contained in the ordinance of said constitution of the people of Kansas, or in the resolutions thereto attached; but the following propositions are hereby offered to the said people of Kansas for their free acceptance or rejection, which, if accepted, shall be obligatory on the United States and upon the said state of Kansas, to wit: . . .

"Sixth. And that the said state shall never tax the lands or the property of the United States in said state: . . ."

The propositions contained in this act of congress were "accepted, ratified and confirmed" by a joint resolution of the legislature of the state (Comp. Laws 1862, ch. 6). In this manner the right of the state of Kansas to tax property owned by the federal government and situated in this state was settled, and any question concerning it is quite foreign to the questions before us.

The second point argued misconceives the fundamental rights as between a state and the federal government with respect to taxation. Before the adoption of the federal constitution each state, generally speaking, possessed power to tax, either directly or indirectly, all persons and property within its jurisdiction. In *Lane County v. Oregon*, 7 Wall. 77, 19 L. Ed. 101, it was said:

"In respect, however, to property, business, and persons, within their respective limits, their power of taxation remained and remains entire."

When the federal government was formed the states respectively relinquish their power to lay any imposts or duties on imports or exports, except as necessary for the execution of the states' inspection laws. (U. S. Const., art 1, § 8.) By the adoption of the constitution a federal government was created as a nation among the nations of the world, and was given all the power, either specifically expressed or necessarily implied, to carry out the functions of such a government. It is these federal governmental functions which a state cannot tax, because to do so would impair the very federal government which was created. But the power to tax persons or property within a state was not surrendered by the states to the federal government. The fact that the federal government, by an act of congress, creates a corporation as an agent of the federal government designed to be employed, and actually employed, in the legitimate service of the government, does not in and of itself exempt the property of the corporation situated in a state from taxation by the state in common with other property so situated. While the state government is one separate and distinct from that of the federal government, they are related governments. There are many subjects over which the federal government and the state governments have concurrent, or related, powers. That is true in certain questions of taxation. In *Van Allen v. The Assessors,* supra, it was said (p. 585):

"The power of taxation under the constitution as a general rule, and as has been repeatedly recognized in adjudged cases in this court, is a concurrent power. The qualifications of the rule are the exclusion of the states from the taxation of the means and instruments employed in the exercise of the functions of the federal government."

In *Union Pacific R. R. Co. v. Peniston,* 18 Wall. 5, 21 L. Ed. 787, it was said (p. 29):

"That the taxing power of a state is one of its attributes of sovereignty; that it exists independently of the constitution of the United States, and underived from that instrument; and that it may be exercised to an unlimited extent upon all property, trades, business, and avocations existing or carried on within the territorial boundaries of the state, except so far as it has been surrendered to the federal government, either expressly or by necessary implication, are propositions that have often been asserted by this court. . . . It is, indeed, a concurrent power (concurrent with that of the general government), and in the case of a tax upon the same subject by both governments, the claim of the United States as the supreme authority must be preferred; but with this qualification it is absolute. The extent to which it shall be exercised, the subjects upon which it shall be exercised, and the mode in

which it shall be exercised, are all equally within the discretion of the legislatures to which the states commit the exercise of the power. That discretion is restrained only by the will of the people expressed in the state constitutions, or through elections, and by the condition that it must not be so used as to burden or embarrass the operations of the national government."

The case last cited involved the validity of a statute of the state of Nebraska which levied a tax upon the property of the Union Pacific Railroad Company, a corporation created by an act of congress as an agent of the general government to carry out certain governmental purposes. It was argued that the property being used for governmental purposes was not subject to taxation by the state. On this point the court said:

"It may . . . be considered as settled that no constitutional implications prohibit a state tax upon the property of an agent of the government merely because it is the property of such an agent. A contrary doctrine would greatly embarrass the states in the collection of their necessary revenue without any corresponding advantage to the United States. A very large proportion of the property within the states is employed in execution of the powers of the government. It belongs to governmental agents, and it is not only used, but it is necessary for their agencies. United States mails, troops, and munitions of war are carried upon almost every railroad. Telegraph lines are employed in the national service. So are steamboats, horses, stagecoaches, foundries, shipyards, and multitudes of manufacturing establishments. They are the property of natural persons, or of corporations, who are instruments or agents of the general government, and they are the hands by which the objects of the government are attained. Were they exempt from liability to contribute to the revenue of the states it is manifest the state governments would be paralyzed. While it is of the utmost importance that all the powers vested by the constitution of the United States in the general government should be preserved in full efficiency, and while recent events have called for the most unembarrassed exercise of many of those powers, it has never been decided that state taxation of such property is impliedly prohibited. . . .

"It is, therefore, manifest that exemption of federal agencies from state taxation is dependent, not upon the nature of the agents, or upon the mode of their constitution, or upon the fact that they are agents, but upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of power to serve the government as they were intended to serve it, or does hinder the efficient exercise of their power. A tax upon their property has no such necessary effect. It leaves them free to discharge the duties they have undertaken to perform. A tax upon their operations is a direct obstruction to the exercise of federal powers." (pp. 33, 36.)

See, also, *Farmers Bank v. Minnesota*, 232 U. S. 516, 58 L. Ed. 707; *Choctaw, O. & G. R. R. Co. v. Mackey*, 256 U. S. 531, 65 L. Ed. 1076, and the many other cases cited in Rose's Notes.

The first bank of the United States (1 Stat. 191) established

branches in the various states. One of these was at Savannah, Ga. In 1805 the Georgia legislature passed an act to tax this bank. The tax was levied and collected over protest. The bank sued in the federal circuit court to recover the tax collected. The circuit court held plaintiff had no capacity to maintain the action (Fed. Case No. 916). This ruling was reversed by the supreme court (*Bank of United States v. Deveaux*, 5 Cranch. 61, 3 L. Ed. 38), but the opinion does not discuss the merits of the case further than to say: ". . . the court is of the opinion that the averment in this case is sufficient." How the case was later disposed of is not shown by the reports. The second bank of the United States (3 Stat. 266) established branch banks in the various states. One of these was in Maryland, another in Ohio. The Maryland legislature (Feb. 11, 1818) passed an act, that any bank established without authority of the state should issue its circulating notes on paper furnished by the state treasurer, for which a heavy tax was charged, or in lieu thereof pay a tax of $15,000. This act was held void as imposing a tax on the operations of the federal government (*McCulloch v. Maryland*, 4 Wheat. 316, 4 L. Ed. 579). But it was said in the opinion:

"This opinion does not deprive the states of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the state, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the state. But this is a tax on the operations of the bank, and is, consequently, a tax on the operation of an instrument employed by the government of the union to carry its powers into execution. Such a tax must be unconstitutional." (p. 436.)

The legislature of Ohio passed an act (Feb. 8, 1819) to levy and collect a tax on banks transacting business without being authorized to do so by a state law. This act levied an annual tax of $50,000 on the branch bank of the United States doing business in that state. The act was held void. (*Osborn v. Bank of the United States*, 9 Wheat. 738, 6 L. Ed. 204.) Much is said in the opinion about the tax being on the business and activities of the bank necessary to carry out governmental functions. In the opinion it was said:

"If the trade of the bank be essential to its character as a machine for the fiscal operations of the government, that trade must be as exempt from state control as the actual conveyance of the public money. Indeed, a tax bears

upon the whole machine; as well upon the faculty of collecting and transmitting the money of the nation, as on that of discounting the notes of individuals. No distinction is taken between them. Considering the capacity of carrying on the trade of banking, as an important feature in the character of this corporation, which was necessary to make it a fit instrument for the objects for which it was created, the court adheres to its decision in the case of *McCulloch v. The State of Maryland,* and is of opinion that the act of the state of Ohio, which is certainly much more objectionable than that of the state of Maryland, is repugnant to a law of the United States, made in pursuance of the constitution, and therefore void." (p. 867.)

The court distinguished between the activities of the bank and its property situated in the state by comparing it with a contractor. In the opinion it was said:

"Can a contractor, for supplying a military post with provisions, be restrained from making purchases within any state, or from transporting the provisions to the place at which the troops were stationed? or could he be fined or taxed for doing so? We have not yet heard these questions answered in the affirmative. It is true, that the property of the contractor may be taxed, as the property of other citizens; and so may the local property of the bank. But we do not admit that the act of purchasing, or of conveying the articles purchased, can be under state control." (p. 867.)

See the discussion of these cases in *Union Pacific R. R. Co. v. Peniston,* supra.

There are other decisions to the same effect. Doubtless congress was familiar with them when it passed the acts to provide a national currency and for its circulation and redemption through banking associations organized under the provisions of the acts (12 Stat. 665; 13 Stat. 99). In section 41 of the later act it was provided that certain expenses be paid from taxes or duties assessed on the circulation and collected from the banking associations, "and in lieu of all existing taxes every association shall pay to the treasurer of the United States," certain specified taxes or duties;

"*Provided,* That nothing in this act shall be construed to prevent all the shares in any of the said associations, held by any person or body corporate, from being included in the valuation of personal property of such person or corporation in the assessment of taxes imposed by or under state authority at the place where such bank is located, and not elsewhere, but not at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state: *Provided further,* That the tax so imposed under the laws of any state upon the shares of any of the associations authorized by this act shall not exceed the rate imposed upon the shares in any of the banks organized under authority of the state where such association is located: *Provided, also,* That nothing in this act shall exempt the real estate of associa-

tions from either state, county, or municipal taxes to the same extent, according to its value, as other real estate is taxed."

This, as amended by the act of February 10, 1868 (15 Stat. 34), became section 5219 of the Revised Statutes of the United States of 1878, and has since been amended. In *Voran v. Wright,* supra, it is set out in the form pertinent to that case and to this one. It would be interesting to analyze many of the cases construing or applying this statute, but it is not essential to do so, and this opinion is too long now. The cases are collected in U. S. C. A., title 12, section 548, and some of the later pertinent cases are discussed in *Voran v. Wright,* supra. Counsel for defendant argue that congress could, if it cared to do so, prohibit any tax by the state on the business activity or on the real estate, or on the property of a national bank, or on the shares of stock of national banks. This presents a purely academic question. It is sufficient to say that congress has not done so. On the other hand, congress has recognized the right of the states to tax not only the real estate of national banks on the same basis as other real estate is taxed, but also as the personal property of the shareholders, their interest in such banks as represented by the value of the shares of stock owned by them. This is in harmony with the principles laid down in the cases just cited (*McCulloch v. Maryland, Osborn v. The Bank of the United States, Union Pacific R. R. Co. v. Peniston*) and allied cases. Congress did not authorize the states to tax the functions or activities of national banks as federal agents for the issuing, circulation and redemption of a national currency, and this is in harmony with those cases. In my view there is nothing wrong about that. The need of a national currency is as great, or greater, now as when the national bank act was first passed, for both the population and the volume of business of the nation have greatly increased, and though the public debt incurred during the civil war was much reduced thereafter, it is again greatly augmented by expenses made necessary by the world war. The federal statute does provide that the tax imposed upon the shares of stock of national banks by a state "shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of the state coming into competition with the business of national banks." This provision was inserted to prevent unjust discrimination against national banks in favor of state banks and other corporations, firms and individuals doing business in competition with national banks. Perhaps it was

not necessary to insert such a provision in the act, for possibly the same discrimination might have been avoided under some of the federal constitutional provisions; but it was deemed by congress to be an appropriate provision to incorporate in the act, and, generally speaking, it is a just and prudent provision. However, it has made it difficult for some of the states to arrange their own taxation systems as they wished to arrange them. The difficulties experienced in the state of New York are indicated by the case of *People v. Burke*, 253 N. Y. 85, and cases there cited. But we shall not go extensively into the history of this matter in the various states. I think it is true that in the states where the constitution and statutes provide substantially for the assessment and taxation of all property at a uniform rate no difficulty was experienced with the federal statute. We had no difficulty in this state prior to the amendment of our constitution in 1924. But in states where, by the constitution and statutes, different kinds of property were classified, and some classes of property were taxed at a lower rate than others, much difficulty has arisen. It is argued that the federal government, by the statute in question, does not dictate to the states how, or at what rate, they shall tax real estate and the various kinds of personal property situated within the state, and this is true. In effect congress has said to the states: Tax the moneyed capital of your individual citizens as you please, but when you have fixed a plan for the valuation of such moneyed capital, and a rate for its taxation, you cannot tax the shares of stock of national banks at a greater rate. In this state, as in some others, the question of how the application of that statute will affect the rate of taxation upon real property depends upon the constitution and laws of the state. In this state our constitution requires that all taxable property shall be taxed at the same rate (except the four specific kinds of property which the legislature is authorized to classify and tax as to class). The property to which this uniform rate must, under our constitution, apply, includes real estate, tangible personal property, the property of railroads, of telegraph and similar companies, of express companies, car companies, of merchants and manufacturers, and of shares of stock in both state and national banks. A similar question was presented in *State v. Mady*, 83 Mont. 418. There a state statute provided that for the purpose of taxation the taxable property of the state

should be classified in seven classes. The first four classes were not applicable to the question before the court. Class 5 includes moneys and credits. Class 6 includes shares of stock of national banks "and the moneyed capital employed in conducting a banking business by any other banking corporation, association, or individual in this state." (This was interpreted not to include shares of stock in state banks.) Class 7 includes all property not in the six preceding classes. (This was interpreted to include shares of stock in state banks.) The statute provided that property described in class 5 should be taxed at 7 per cent of its value, and that the properties described in classes 6 and 7 should be taxed at 40 per cent of its value. In the case of *Commercial National Bank v. Custer County*, 76 Mont. 45, it was contended that the shares of stock of national banks could not be taxed at a greater rate than the 7 per cent provided for the moneys and credits defined in class 5. The state court held against that contention, but its holding was reversed by the supreme court of the United States in the memorandum opinion, 275 U. S. 502, "on the authority of *First National Bank of Hartford v. Hartford*, 273 U. S. 548; *Minnesota v. First National Bank of St. Paul*, 273 U. S. 561." Following that ruling the case of *State v. Mady*, supra, came before the state supreme court. It involved the question of the rate of tax on shares of stock of state banks. The court said: "It is admitted that the shares of stock of both state and national banks are property of the same kind, character and class." The question was: Since the shares of stock of national banks could not be taxed at a greater rate than 7 per cent, as was money and credits defined by class 5, could the state properly tax the shares of stock of state banks which fell in class 7 on the 40 per cent basis? It was held that the shares of stock of the state banks could not be taxed on the 40 per cent basis. It was argued in that case that the federal statute could not control the rate of tax which the state might levy on the shares of stock of state banks. The opinion conceded that to be true, but held that the matter was controlled by the constitution of the state. In the opinion it was said:

"The difficulty here arises chiefly upon the requirements of the state constitution. It requires the taxation of all property not exempt, and that the tax must be uniform upon the same class of subjects. The congressional requirement we are considering is not inconsistent with our constitutional provision requiring uniformity. It is thus our own fundamental law, acting co-

ordinately with the law of congress, which compels the state to tax state as well as national bank shares upon the same basis." (p. 426.)

The same reasoning applies here.

The views expressed in my separate opinion in *Voran v. Wright,* 129 Kan. 601, 284 Pac. 807, beginning at p. 620 to the close, are applicable to this case, and need not be repeated. I simply wish to add that in my judgment the decision of the court in this case has denied to plaintiff the equal and uniform rate of taxation guaranteed to him by the constitution of our state.