No. 29,900.

THE CITIZENS BANK OF GALENA, *Plaintiff*, v. THE TAX COMMISSION OF THE STATE OF KANSAS et al., *Defendants*.

No. 29,901.

THE WHEELER, KELLY, HAGNY TRUST COMPANY, *Plaintiff*, v. THE TAX COMMISSION OF THE STATE OF KANSAS et al., *Defendants*.

No. 29,902.

THE DAVIS-WELLCOME MORTGAGE COMPANY, *Plaintiff*, v. THE TAX COMMISSION OF THE STATE OF KANSAS et al., *Defendants*.

(294 Pac. 940.)

Opinion filed January 10, 1931.

*Bennett R. Wheeler, S. M. Brewster, John L. Hunt, V. V. Scholes* and *Margaret McGurnaghan,* all of Topeka, for the plaintiffs.

*C. B. Randall,* of Topeka, for the state tax commission.

*William A. Smith,* attorney-general, *John G. Egan* and *Arthur S. Brewster,* assistant attorneys-general, and *William J. Wertz,* county attorney of Sedgwick county, for the defendants.

The opinion of the court was delivered by

BURCH, J.: These are actions of mandamus, commenced to settle questions relating to taxation of a bank, a trust company, and a mortgage company. The questions are of the same nature, and the cases may be considered together.

In the year 1924 the tax problem in Kansas was supposedly solved by an amendment to the constitution permitting classification of property for purpose of taxation. In 1925, pursuant to the amendment, the legislature passed laws favoring classes of property with a very low rate of taxation. As frequently occurs, expected benefits were not fully realized, and some unexpected results followed. Chiefly because certain results were feared which did not follow, a special session of the legislature was called early in 1930 to consider the tax laws.

At the special session the law providing for a low tax rate on moneys and credits (Laws of 1927, ch. 326) was repealed. The law defining secured debts to include municipal bonds, and providing for a small stamp tax on such securities (Laws 1927, ch. 327), was also repealed, and the following statute was enacted:

"SEC. 2. That all secured debts as defined in chapter 327, Laws of 1927, which have been stamped and the tax fully paid thereon as provided in said

chapter shall not be subject to further taxation until the maturity of such secured debts as fixed in the terms thereof." (Laws Special Session, 1930, ch. 19.)

A bill to repeal the mortgage registration law providing for a small tax on recorded mortgages by means of a registration fee (Laws 1925, ch. 273) failed to pass. The law relating to taxation of shares of bank stock (Laws 1925, ch. 276) was amended (Laws Special Session 1930, ch. 16). A copy of section 1 of this statute is appended hereto.

The statute applied to returns of property for taxation for the year 1930.

The tax return of the Citizens Bank contained a statement of its financial condition as of March 1, 1930, as required by the tax commission. A copy of the statement follows:

RESOURCES.

| | |
|---|---:|
| Loans and discounts | $83,020.02 |
| Loans on real estate | 17,801.00 |
| Overdrafts | 337.50 |
| Other real estate owned | 3,300.00 |
| Bank building, $1,500; furniture and fixtures, $225 | 1,725.00 |
| United States bonds on hand | 68,250.00 |
| Other bonds and warrants | 79,750.00 |
| Cash items and clearing-house items | 712.43 |
| Cash and sight exchange, legal reserve | 32,668.17 |
| Total | $287,564.12 |

LIABILITIES.

| | |
|---|---:|
| Capital stock paid in | $25,000.00 |
| Surplus fund | 25,000.00 |
| Undivided profits, net | 1,050.35 |
| Demand deposits | 158,854.25 |
| Time deposits | 73,306.17 |
| Cashier's and certified checks | 50.00 |
| Reserve for interest, taxes, and other expense, accrued and unpaid | 2,803.35 |
| Other liabilities | 1,500.00 |
| Total | $287,564.12 |

Appended to the return, by permission of the tax commission, was a list of tax-exempt securities forming part of the bank's assets and included in its statement of resources. The list follows:

| | |
|---|---:|
| Registered real-estate mortgages on which tax had been paid pursuant to mortgage registration law | $13,118 |
| Tax-free Kansas municipal bonds | 64,750 |
| Nontaxable federal land-bank bonds | 10,000 |
| Nontaxable U. S. Bonds and treasury notes | 68,250 |
| Total | $156,118 |

The bank's real estate and tangible personal property were assessed to the bank, and by direction of the tax commission the shareholders were assessed on the amount of the bank's capital, surplus and undivided profits, $51,050.35, less assessed value of real and personal property,, without any allowance on account of tax-free assets, which constituted approximately 54 per cent of the gross assets. The mortgage company and its stockholders, and the trust company and its stockholders, were assessed in the same way. The mortgage company appended to its return a statement showing that there were included in its gross and net assets real-estate mortgages on which the registration fee had been paid in the sum of $467,143.72. The statement attached to the trust company's return showed that among its assets were Liberty bonds and shares in Kansas corporations which were exempt from taxation to shareholders in the sum of $144,100.

The affirmative defense to the cases of the bank and the mortgage company is that the mortgage registration law is unconstitutional. The article of the constitution relating to finance and taxation as amended in 1924 reads as follows:

"The legislature shall provide for a uniform and equal rate of assessment and taxation, except that mineral products, money, mortgages, notes and other evidence of debt may be classified and taxed uniformly as to class as the legislature shall provide." (R. S. Supp., art. 11, § 1.)

The mortgage registration law provides that real-estate mortgages, defined to include other instruments of real-estate security, may not be received and filed for record until payment is made of a fee of 25 cents per $100 of the principal debt. On payment of the fee, the mortgage and the note secured by it shall not thereafter be otherwise taxable. Holders of mortgages already recorded were granted privilege to take the benefit of the act by paying the tax on the amount due at the time the privilege is exercised. The contention is that the law violates the constitutional requirement of uniform taxation of classes, in that the law discriminates against unrecorded real-estate mortgages, mortgages on personal property, and mortgages on land and personal property in other states held by residents of this state. The contention is unsound.

The plain reading of the amended statute is that mineral products may be classified by placing oil in one class, coal in another, and lead and zinc in another; and so on with other classifiable things,

including mortgages. An analogous question was pressed upon the attention of the court in the case of *Davis-Wellcome Mortgage Co. v. Haynes*, 119 Kan. 1, 237 Pac. 918, and the court said:

"The purpose of the amendment is not that money, mortgages and notes may be grouped as a class by themselves and taxed uniformly, but that they may be grouped in such classes as the legislature may find suitable, the taxation to be uniform as to the members of the same class." (p. 7.)

So mortgages may be classified for purpose of taxation if there is fair basis for classification.

The problem of taxation of the real-estate mortgage has been before the people of the state for years. The legislature tried to solve it by the statute held invalid in *Wheeler v. Weightman*, 96 Kan. 50, 149 Pac. 977 (1915). Solution of the problem was one of the objects to be attained by amending the constitution. The elements of the problem are matters of common knowledge, and it is not necessary to descant upon them here. After the constitution was amended, the legislature made a sincere effort to solve the problem by the mortgage registration law. The law has been in operation nearly six years, and at the special session of 1930 the legislature refused to repeal it. Under these circumstances, the demonstration of unconstitutionality must be convincing to induce the court to hold the law void.

The principal reason given by the tax commission for invalidity of the classification is that power to classify has actually been exercised, mortgages of Kansas real estate, presented for record, have been segregated from other kinds and given a low rate, and other kinds are left to devastation by the *ad valorem* rate. The following examples are given:

"A resident taxpayer of Topeka, the owner of mortgages on property in Shawnee county and in the state of Nebraska, would pay, in the event his Kansas mortgage was registered, an initial tax of 25 cents on each $100 of the obligation secured and $3.71 on his Nebraska mortgage. If our hypothetical taxpayer was the owner of an additional Shawnee county mortgage and failed to register it, he would pay $3.71 on each $100 of the obligation secured."

The nature and economic function of the real-estate mortgage, and considerations of taxation policy, are clearly sufficient to distinguish that kind of mortgage from chattel mortgages. The peril to the security consequent on failure to record will bring real-estate mortgages generally to record, and those who keep

their mortgages off the record to avoid paying taxes may be charged the general rate—if the assessors can find the mortgages.

Kansas may properly look to taxable property in Kansas as a source of revenue. Kansas real-estate mortgages have a rather intimate relation to Kansas land. Land cannot be concealed, or removed to the domicile of nonresident owners, or holders, or depositaries. One interest in land, the interest of the owner, pays the inescapable *ad valorem* rate. There is no equivalent for this tax back of a mortgage on Nebraska land held by a resident of this state.

The tax commission differs from the legislature with respect to what the proper amount of the registration fee should be, and because the tax commission thinks the fee is too small the tax commission says the law is a nullity. The court is of the opinion that, in view of the many things to be considered, the proper amount of tax was a legislative question.

Without pursuing the subject further, the court holds the mortgage registration law is constitutional and valid.

The real defense to the actions is, in essence and effect, that fundamentally the decision in the case of *Stevenson v. Metsker*, 130 Kan. 251, 286 Pac. 673, is unsound, and to an extent the decision in *Voran v. Wright,* 129 Kan. 601, 284 Pac. 807, is unsound. The court adheres to the opinions in both cases, and this opinion might well end here. Because, however, as Lord Bacon said of the Statute of Uses (Works vii, 395), the tax law is "a law whereupon the inheritances of this realm are tossed at this day as upon a sea," the court will supplement the opinions in the cases referred to by some further observations.

In the year 1865, the supreme court of the United States, by a divided court, rendered the decision in the case of *Van Allen v. The Assessors,* 3 Wall. 573. An act of congress was in existence which corresponds to U. S. Rev. Stat. 5219, and the high point in the case was this: Could a state tax shares of a national bank to the shareholders, when the capital of the bank consisted wholly of tax-exempt bonds and other securities of the United States? The decision was that the shareholders could be taxed on their shares. The decision rested on the well-known distinction in corporation law between property of the bank and property of the shareholder. The bank owned its assets, consisting of the tax-exempt securities. The shareholder had no property interest in them. His property interest was something separate and distinct

from the bank's property interest, and he could be taxed on his property.

A quotation from the opinion in the Van Allen case appears in the opinion in *Bank v. Geary County*, 102 Kan. 334, 170 Pac. 33, in which the ground of the Van Allen decision was accepted, approved, and applied. The decision in the Geary county case was cited in the Voran case, and the distinction furnishing the basis for the decision in the Van Allen case was spelled out in the Stevenson case. The briefs of the tax commission and the attorney-general contain discussion of topics such as these:

"Shares and corporate property are distinct classes of property, each subject to assessment and taxation independent of the other."

"Exempt or otherwise taxed property belonging to corporations may not be deducted from the assessment of shares."

"Shares of stock in a corporation are a separate property from that of the corporation, and may be taxed separately."

The discussions are fortified by an array of authorities approving and applying the doctrine of the Van Allen case. All this is supererogatory. The court knew all about the Van Allen case, and decisions of federal and state courts approving and applying it, when the Voran and Stevenson cases were decided, and the court was careful in the Stevenson case to leave the doctrine of the Van Allen case in the tax law of this state. The doctrine of the Van Allen decision, and certain subsidiary principles, may have a proper place in the tax law of a state; but the doctrine cannot be allowed to become an obsession, impelling action in reckless disregard of constitutional provisions and principles, and cannot be followed to the destruction of a rational tax system.

If at any time, for many years previous to 1924, a newcomer desiring to start a bank in this state had asked, "How are banks taxed?" a person having a legal mind would have answered, his hand over his mouth and one eye shut: "They are not taxed; capital stock, surplus, undivided profits, and all the assets belong to the bank, and they are not taxed at all, with the exception of real estate." If the questioner had asked, "Have you no law providing for taxation of the property of banks other than real estate?" the answer would have been, "Yes, we have a mandatory provision of the constitution requiring such taxation; but the legislature exempts the property of banks from taxation."

The provision of the constitution referred to was very plain and comprehensive, and reads thus:

"The legislature shall provide for taxing the notes and bills discounted or purchased, moneys loaned, and other property, effects, or dues of every description, (without deduction) of all banks now existing, or hereafter to be created, and of all bankers; so that all property employed in banking shall always bear a burden of taxation equal to that imposed upon the property of individuals." (Art. 11, § 2.)

Except for substitution of the words, "The legislature," in place of the words, "The general assembly," the provision was taken bodily from an amendment inserted in the constitution of the state of Ohio in the year 1852 (art. 12, § 3). Ohio had had much experience with all the different kinds of banks and bankers—incorporated and unincorporated banks, banks of issue and banks not of issue, state banks, private banks, banker firms, and individual bankers—and the purpose of the new constitutional provision was that all property employed in banking, no matter by whom employed, should bear a tax burden equal to the burden on the property of individuals not engaged in banking.

Some private bankers contended that the new constitutional provision applied to banks of issue only. The question was determined adversely to the contention by the supreme court of Ohio in the case of *Ellis & Morton v. Linck and Thomas*, 3 Ohio St. 66. Because the decision is a matter of historical interest and importance, portions of the opinion (after quotation of the new constitutional provision) follow:

"The taxation, without deduction, of every conceivable description of property of all banks which may at any time exist in Ohio, is thus clearly and fully provided for without the introduction into the section of the words, 'and of all bankers'; and in giving construction to the section, we are to conclude that the framers of the constitution have adopted an unmeaning description of persons, or that they intended to provide for the taxation by the same rule, of the same property in other hands as well as though it were the property of chartered banks.

"And leaving the circle of incorporated banks, and going out into the world to look for bankers, where will they be found, unless they are described in the agreed statement here presented? They are thus shown to be engaged in every department of banking business, except the mere thing of issuing notes intended to circulate as money—a privilege almost always exercised by an incorporated bank, but which is not at all essential to the existence of a bank, and which does not necessarily enter into its definition. Every business man in community knows that the class of persons to which these plaintiffs belong transact the greater part of the banking business of the country; and if we were not forbidden, by every rule of construction, to exempt them from the operation of the section of the constitution referred to—if it were possible to adopt the conclusion for which they contend, it is manifest that property

employed in banking in Ohio, instead of being taxed, without deduction, as the constitution has plainly intended, would utterly escape taxation. . . .

"A question is also made by counsel, as to whether deposits of money with bankers are to be considered as the property of the bankers, and, as such, liable to taxation.

"It is well known that the current deposits of most of these private bankers constitute the principal capital employed by them in banking operations; and in the absence of special agreement to the contrary, the moneys deposited go into the general fund which constitutes the basis of all their business operations—the person receiving the deposit becoming liable, not for the return of the specific money deposited, but indebted to the depositor generally for the amount. And whether these deposits are used in the discounting of paper, in the purchase of notes and bills, or held in reserve to pay current demands, they are equally the money of the banker, and are equally employed in the business of banking." (pp. 70, 71, 72.)

The opinion was written by H. J. Corwin, and was concurred in by Allen G. Thurman and William G. Caldwell. The judgment in the case determined another question, and Rufus B. Ranney concurred in the judgment, but dissented as to some of the reasons given for it. The chief justice, Thomas W. Bartley, dissented.

The decision was rendered at the December, 1853, term of the Ohio court. The constitution of this state, which included the interpreted section, was signed by the president of the constitutional convention on July 29, 1859. When the section became effective, the law was that the section meant what the supreme court of Ohio said it meant. (See *Bemis v. Becker*, 1 Kan. 226 [1862]; *Stebbins v. Guthrie*, 4 Kan. 353 [1868]; *Leavenworth County v. Miller*, 7 Kan. 479, 509 [1871]; *A. T. & S. F. Rld. Co. v. Franklin*, 23 Kan. 74, 80 [1879].)

The section continued to mean that all property employed in banking should be taxed as other property is taxed, until the section was suppressed in 1924.

The federal statute did not concede to the states permission to tax assets of national banks. Here is a late condensed statement of the resources of a national bank of Kansas having a capital stock of $500,000, a surplus of $200,000, and undivided profits of $300,000:

| | |
|---|---|
| Loans and discounts | $4,038,187.38 |
| Bank building | 225,000.00 |
| Furniture and fixtures | 25,000.00 |
| Federal reserve bank stock | 21,000.00 |
| Government and municipal bonds | 2,290,459.96 |
| Cash and due from banks | 2,153,071.49 |
| Total | $8,752,718.73 |

Congress does not permit any of this property to be taxed by the state, except real estate. As explained in the Geary county case and the Stevenson case, the legislature felt obliged to exempt the property of state banks from taxation, in order that they might be on an equal footing with national banks. The court stood for that on the ground of overriding economic necessity, when bank shares were in fact valued and taxed.

The tax law of 1876, taxing shares of bank stock, effected exemption of the property of state banks only. (Laws 1876, ch. 34, § 22.) The statute of 1891 also effected exemption of the property of loan and investment companies. (Laws 1891, ch. 84, § 1.) In 1919 the description "loan and investment companies" was changed to "loan and trust companies." The statute of 1930 effects exemption from taxation of property of loan companies, trust companies, investment companies, and finance companies, besides the property of banks. The exemption clause of the article of the constitution relating to finance and taxation read and still reads as follows:

"But all property used exclusively for state, county, municipal, literary, educational, scientific, religious, benevolent and charitable purposes, and personal property to the amount of at least two hundred dollars for each family, shall be exempted from taxation." (Art. 11, § 1.)

That indicates in a general way the kinds of exemption the legislature may make. The subject was considered in the opinion in the case of *Wheeler v. Weightman*, 96 Kan. 50, 149 Pac. 977, and all the decisions were collated to that time. The framers of the constitution would, according to the old saying, "turn in their graves" if they knew the provision of the constitution relating to exemption had been employed to exempt from taxation the assets of just one business concern of Topeka, in the sum remaining after real estate and tangible personal property had been deducted from gross assets, of more than $675,000.

Shares of corporate stock are not mineral, nor mortgage, nor note, nor other evidence of indebtedness excepted by the amended constitution from the requirement of uniform and equal rate of assessment. Shares of corporate stock are simply property interests of shareholders, on equal footing with the common unclassified property of the state. In the case of *Wheeler v. Weightman*, 96 Kan. 50, 149 Pac. 977, the court said:

"The constitutional command is that the legislature shall provide for a uniform and equal rate of assessment and taxation. Assessment is a prerequi-

site to the application of any rate of taxation, and assessment includes listing and valuation. This is fundamental, and cannot be evaded by any shift or device whatever." (p. 53.)

Until 1919 bank shares were assessed, and they were valued at their true value, which meant actual value. Since 1919 they have not been valued or assessed. Let it be remembered that there is a dead line between property of the bank and property of the shareholder. Capital stock, surplus, undivided profits, assets of all kinds, are property of the bank. The shareholder has no property interest in them. What he has is property of an entirely distinct and different kind. (*Van Allen v. The Assessors,* 3 Wall. 573.) Since 1919 certain portions only of the property of the bank, which may or may not have corresponding actual value, are taken at their book value; the assessed value of the bank's real estate is deducted from this paper value of bank property; the remainder is arbitrarily assigned to stockholders, without reference to value of their property. As stated in the opinion in the Stevenson case, this is a statutory rule, there is no other rule, and no assessor can do otherwise than follow the statutory rule.

Comparison of the 1919 statute with the one it amended clearly disclosed that the change in manner of assessing bank shares was designedly made. Besides that, it appears that the nature of the change was fully understood at the time, and the tax commission helped to bring the change about.

*The Kansas Banker,* a magazine published by the Kansas Bankers' Association, reviewed the work of the legislature at its 1919 session. Concerning the act under consideration, the magazine said, editorially:

"This bill determines finally the basis for the assessment of shares of bank stock for taxation. Beginning with March, 1919, bank shares will hereafter, under this law, be assessed upon their book value, capital, surplus and undivided profits, plus any other earnings which may not have been carried to profit and loss account, but which are carried in separate accounts.

"Much confusion has been visited upon the banks and upon the tax commission itself by the attempt to assess bank shares by that indefinite term 'actual value'—correct in theory, but difficult of application at the hands of local assessors, however conscientious and well-meaning, and resulted in a widespread lack of uniformity.

"Perhaps no more difficult and intricate task is committed to the hands of any public servant than that which is committed to the administration of the tax commission. Officers and committees of the association have received no greater courtesies from any source than from Judge Howe, chairman of the

commission, and commissioners Kincaid and Lang. It was largely through the coöperation of the commission that this basis of assessment has been finally formulated into law." (*The Kansas Banker,* March, 1919, pp. 2, 3.)

The standard, true value, or actual value, may be difficult of application to shares of corporate stock by some local assessors. There have been displays of stupidity, and there have been manifestations of invidiousness. Of course, the remedy is not to simplify valuation to the mere doing of a sum in addition, which results in a fiction so far as value of the taxpayer's property is concerned. Actual value is the only definite and factual kind. It is the precise opposite of indefinite and theoretical, and all that is required to determine actual value for taxation purposes is a competent assessing officer.

Classification by the 1930 statute of shareholders in a lot of moneyed institutions other than banking organizations, with shareholders in banking organizations, did not avoid the discrimination dealt with in the Voran case.

U. S. Rev. Stat. 5219 reads as follows:

"In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state coming into competition with the business of national banks."

As shown by the decision in *People v. Weaver,* 100 U. S. 539, cited in the Stevenson case, this provision does not relate to rate only, but has reference to the entire assessment, and includes valuation of the shares as well as the rate of percentage. The statute does not say that the tax on national bank shares shall not be at a greater rate than the tax imposed on other kinds of corporation shares. The rate on national bank shares shall not be greater than that imposed on competitive moneyed capital in the hands of individual citizens, including persons, firms and corporations engaged in competitive business. (*First National Bank v. Hartford,* 273 U. S. 548, 558; *Minnesota v. First National Bank,* 273 U. S. 561, 565.)

Keeping steadfastly in mind the distinction between the two different kinds of owners, the corporation as owner of its property, and shareholders as owners of different property, the Davis-Wellcome Company alone has in its hands much moneyed capital which it employs in competition with the business of national banks. (*Central Nat. Bank v. McFarland,* 20 F. [2d] 416, 418.) None of

that moneyed capital is taxed at all. The same is true of other financial institutions named in the statute, and because the competitive moneyed capital they employ is not taxed, it discriminates against national bank shares to tax national bank shares at any rate. That being true, the shareholders of the Citizens Bank of Galena and other corporations would be discriminated against outrageously if their shares were taxed, and the taxation house of cards falls.

At this point we may well go back to reality, as suggested in the Stevenson case. By doing so, and by considering the statute of 1930 as the court must consider it—as a piece of sincere legislation, and not as legerdemain to break faith pledged in the earlier tax-reform acts, the statute is not open to insurmountable objection.

The tax process begins with listing and valuation. The statute provides that capital stock, surplus and undivided profits shall be listed. These items do represent property interests of the corporation, in corporation law and in tax law. The terms capital stock, surplus and undivided profits are mere names for what, for want of a better term, may be called demands on assets. These demands are valued. There is no pretense of valuing anything else, and under the statute nothing else can be valued. The demands must be satisfied out of assets. They cannot be satisfied until corporate liabilities are discharged out of assets, and if there are not sufficient assets to discharge corporate liabilities, the demands have no value. The result is that under the statute corporate assets are the ultimate basis of valuation.

Corporate assets are difficult to value, and the statute prescribed a rule by which to value them. The book values of capital stock, surplus and undivided profits are added together, and the sum constitutes the valuation. The rule is perfectly arbitrary. Its application may result in a valuation which bears no relation whatever to actual value. The rule trenches on the constitutional requirement of uniform and equal rate of assessment. All the court can do is to retire behind what Mr. Justice Holmes has called "a convenient apologetic;" the convenient apologetic of legislative discretion in framing a tax system.

The assessed value of part of the corporate assets—real estate and tangible personal property otherwise taxed—is deducted from the total valuation. The remainder is taxed, and must be taxed.

The legislature cannot, as a matter of convenience, resort to wholesale exemption of corporate property, or resort to any exemption of corporate property, to get at some large accumulations of property which in a period of enthusiasm it constitutionally taxed once at a low rate, and relieved from all other taxation.

Considered broadly, what the statute does is to recognize a group of legal relations consisting of a network of rights, privileges, powers and immunities, coming into existence with creation of the corporation, some of which may be discriminated into property interests of the corporation and property interests of the shareholders. (*Ryan v. State Tax Commission*, ante, p. 1, 294 Pac. 938.) Regarding the statute as designed to value and tax the group of relations just once, there is no exemption, there is no discrimination against anybody, and no other tax statute of the state is infringed. The federal statute provides that the state may determine and direct the manner of taxing the shares of national banks, subject to the single qualification that has been noted, and the federal law is satisfied. Since, however, *under the tax law of this state as the legislature has seen fit to frame it,* corporate assets are in fact the ultimate basis of that valuation upon which the tax burden is computed, the burden may not be augmented by including assets which are exempt from taxation, or further taxation, no matter who may be designated as taxpayer. (*Stevenson v. Metsker,* 130 Kan. 251, 286 Pac. 673.)

This view of the statute establishes a degree of equality between corporations named in the statute and those taxable under R. S. 79-310. Those named in the statute have some advantage over those taxable under R. S. 79-310, because in assessing what is loosely called capital under the latter section, actual value, including possessions, rights, franchises, good will and earning capacity, is to be considered. (*Building Co. v. Saline County,* 98 Kan. 732, 160 Pac. 971.)

The foregoing is not in harmony with the views expressed in the final opinion in the case of *Ranchmen's Trust Co. v. Duncan,* 114 Kan. 308, 219 Pac. 523. That decision was rendered in 1923. The constitution had not been amended, the mortgage registration and so-called intangible tax laws of 1925 had not been enacted, and complications consequent on their operation were not foreseen. In the first opinion, the decision in the case of *Bank of California v. Richardson,* 248 U. S. 476, was followed. In the second opinion the

decision in the Bank of California case was not followed, on the ground it was later than the Kansas statute which established the policy of this state. But for that view, the first opinion would have been adhered to. The result was lack of uniformity in treatment of national and state banks, to the disadvantage of the state banks. The second opinion was based on the statute of 1919. But that statute was not analyzed. It was assumed it made no substantial change in the law of 1891, when in fact it made a very material change. It was assumed the interpretation placed on the statute of 1891 by the decision in the case of *Bank v. Geary County,* 102 Kan. 334, 170 Pac. 33, applied to the 1919 statute. The fact was, as shown above, and as shown in the opinion in the Stevenson case, the interpretation of the earlier act could not apply to the later act. No effort was made to find ultimate foundation for tax burden, and discrimination in taxation between shareholders in national and state banks was not considered, as became necessary in the Voran and Stevenson cases. The decisions in those cases are controlling. The result reached is in harmony with the federal decision.

It is not necessary to extend this opinion to greater length. The writs of mandamus have been allowed.

SMITH, J., not participating.

HARVEY, J. (dissenting in part): I concur in the holding that the mortgage registration law (Laws 1925, ch. 273) is constitutional. I dissent from the remainder of the opinion, and on the principal point determined therein I adhere to the views expressed in my separate opinion, dissenting in part, in *Voran v. Wright,* 129 Kan. 601, 617, 284 Pac. 807, and in my dissenting opinion in *Stevenson v. Metsker,* 130 Kan. 251, 262, 286 Pac. 673. While much more could be said on the subject, perhaps it would answer no useful purpose to do so.

APPENDIX.

LAWS SPECIAL SESSION 1930, CHAPTER 16.

SECTION 1. That chapter 276 of the Laws of 1925 of the state of Kansas be and the same is hereby amended to read as follows: Section 1. Shares of stock issued by (1) national banks, (2) state banks, (3) savings banks, (4) other banking organizations, (5) loan companies, (6) trust companies, (7) investment companies, (8) finance companies, shall be assessed to the individual shareholders at the place where the particular company or corporation is

located: *Provided,* That public-service corporations, insurance companies, express companies and corporations expressly taxed under other provisions of law shall be excepted from the provisions of this act. The president, cashier or other managing officer of each and every company and corporation of the kind named herein, which has issued shares of stock, shall furnish to the assessing officer, upon demand, during the month of March each year, a list of all the shareholders and the number of shares owned by each shareholder, for taxation purposes, and the assessable value of such shares as hereinafter provided. To aid the assessor in fixing the value of such shares, the returning officers shall furnish to the assessor, under oath, a statement correctly showing the amounts of capital stock, surplus and undivided profits as of March first of the current tax year. By undivided profits is meant all earnings of the company or corporation which have not been carried to surplus or paid out in dividends under whatever account carried, whether as undivided profits, exchange, interest, stockholders' account, or other account representing interests of the shareholders. The assessor from such statement shall base his valuation upon capital, surplus and undivided profits, the latter ascertained as provided herein, unless an investigation shall show incorrect returns, in which case the assessor shall determine what returns should have been made to correspond with the facts disclosed by an investigation, and shall revise the returns and use such revised returns as the basis of the assessment: *Provided,* That if any of the capital stock of such companies and corporations is invested in real estate, in which the company or corporation holds the title in fee simple thereto, or intangible personal property which at the time of listing said capital stock shall be particularly assessed for taxation, the taxable assessed value of such real estate or tangible personal property shall be deducted from the original gross valuation of the shares of stock, and such real estate and personal property shall be assessed and taxed as other real estate and personal property: *Provided further,* That real and personal property in any other state or county in this state shall be deducted if it be made to appear that the same has been duly listed for taxation in some other state, or county in this state. The net assessment, when so ascertained, shall be divided among the shareholders proportionately according to the number of shares owned by each shareholder. Any such company or corporation shall pay the taxes assessed upon the shares of stock, and shall have a lien thereon until the same is satisfied: *Provided,* That if for any reason the taxes levied upon the shares of stock shall not be paid by the company or corporation, the property of the individual shareholders shall be held liable therefor.